Filed 10/3/17

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C079280 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF143595) |
| v. | |
| NAN HUI JO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, David Rosenberg, Judge. Affirmed.

Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan, and Matthew Dirkes, Retained Counsel for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Nan Hui Jo was convicted of child custody deprivation (Pen. Code, § 278.5, subd. (a)) and sentenced to 175 days in county jail and thirty-six months probation.[1] On appeal, defendant contends: (1) the trial court improperly instructed the jury on the union of act and criminal intent, (2) the trial court improperly instructed the jury on section 278.7, which provides an affirmative defense to child custody deprivation, over defendant's objection, (3) the trial court failed to properly respond to the jury's questions regarding the relationship between sections 278.5 and 278.7, (4) the trial court improperly refused to give a pinpoint instruction explaining that section 278.7 represents one of many possible defenses to child custody deprivation under section 278.5, (5) the trial court improperly allowed a former prosecutor to testify as to section 278.7's requirements, (6) the prosecutor committed misconduct by misstating the applicable law, (7) the trial court failed to force an election or require unanimity in response to one of the jury's questions, (8) the trial court improperly dismissed one of the jurors during deliberations, and (9) the evidence was insufficient to support the conclusion that defendant acted with malice. We conclude that defendant's first and second arguments have merit, but the errors were harmless. We reject defendant's remaining claims of error. Accordingly, we will affirm the judgment.

## I. BACKGROUND

Defendant, a citizen of Korea, came to the United States on a student visa in 2002. She studied film and worked in Los Angeles for several years, then married and moved briefly to the east coast. In July 2007, defendant, now estranged from her husband, moved to Sacramento to enroll in photography classes at Sacramento City College. There, she met J.C., a veteran of the Iraq war who suffered from post-traumatic stress disorder (PTSD) as a result of his military service.

---

[1] Undesignated statutory references are to the Penal Code.

A. *Defendant's Relationship with J.C.*

Defendant and J.C. became friends, and eventually began dating. J.C. moved into defendant's trailer shortly thereafter. In late 2007, defendant discovered she was pregnant. Defendant, then thirty-five years old, was overjoyed at the news. J.C. was decidedly less enthusiastic. At twenty-four years old, J.C. felt he was not ready to become a father.

As the pregnancy progressed, the couple fought with increasing frequency. These arguments culminated in the first of a series of breakups in the spring of 2008. Following a brief reconciliation, the couple broke up a second time in June 2008. While pregnant, defendant asked the County of Sacramento Department of Child Support Services to obtain an order requiring J.C. to pay child support. Defendant also traveled to South Korea to see her family, returning to the United States on a one year visa in July 2008.

B. *Defendant Gives Birth to V. and Resumes Her Relationship with J.C.*

On September 7, 2008, defendant gave birth to a daughter, V. J.C. initially denied paternity, but subsequently took a paternity test which confirmed that he was V.'s father. J.C. began paying child support in December 2008. J.C. met V. for the first time in February 2009, when he ran into defendant on the campus of Sacramento City College.

In the weeks that followed, J.C. spent more and more time with defendant and V. Eventually, J.C. resumed his romantic relationship with defendant and moved into her house. J.C. continued to pay child support, and also contributed to rent and groceries. Within a month or so, the couple began to argue again.

C. *Defendant's Immigration Problems Intensify, and the Relationship Deteriorates Further*

Defendant's one-year visa was due to expire in July 2009. In July 2009, defendant received a letter from immigration authorities indicating that her application to extend her stay had been denied. Defendant telephoned immigration authorities and learned that she was required to leave the country immediately.

Around the same time, defendant proposed marriage to J.C. J.C. thought the proposal was "absurd," especially in light of the fact that defendant was still married to someone else. When J.C. declined, defendant became very angry. She accused J.C. of not loving her, and explained that her visa was expiring and she would not be allowed to remain in the United States. The couple argued about where to raise V., with defendant wanting to return to South Korea and J.C. wanting to remain in the United States. During one such argument, in August 2009, J.C. punched a wall with such force that he broke his hand.

The couple had another heated argument on the eve of V.'s first birthday, in September 2009. During the course of the argument, which took place in defendant's parked minivan, J.C. punched the steering wheel, thereby reinjuring his hand. J.C. then got out of the minivan and walked away. After stopping at several bars, he flagged down a police officer. J.C. asked the police officer to take him to a VA hospital "because [he] was having a mental breakdown." Instead, the police officer took J.C. to jail. Defendant picked J.C. up the next day, and the couple celebrated V.'s birthday with family and friends.

The couple had an especially bad fight—their first and only physical altercation—on October 18, 2009. Following an angry exchange over some now forgotten bone of contention, J.C. announced that he intended to leave the house. Defendant responded that she, not J.C., would leave. She "tossed" V., then thirteen months old, to J.C. from a distance of arm's length or "[j]ust a little bit further." The child's head struck J.C. in the face. V. began to cry, and J.C., enraged, chased defendant down, grabbed her by the throat, and pushed her up against the wall, lifting her feet off of the ground and choking her. After a moment, J.C. released defendant. Police officers were summoned, but J.C. was not arrested. J.C. went to stay with a friend. He understood that he had crossed a line with defendant, and their relationship would never be the same. Although J.C. continued to visit V., the romantic relationship with defendant was over.

4

By late October 2009, defendant had decided to leave Sacramento and return to South Korea. On October 24, 2009, defendant sent an email to J.C.'s father and his wife, Jenny, who lived in the Los Angeles area. Defendant wrote that she would be arriving in Los Angeles on November 2, 2009, with plans to stay for a couple of weeks before continuing on to Florida for the winter, and then returning to South Korea in March. Defendant wrote: "Before go to Florida I want to visit. I want to visit you, and I have to do couple of things in LA. And, also, I have to wait [J.C.]'s agreement paper by court for leaving with baby. It's going to take a time for two to three weeks." (Errors in original.)

Defendant emailed Jenny and J.C.'s father again on October 26, 2009. In her email, defendant wrote: "It seems getting worse with [J.C.] He said he just want baby grow up around him, neither with me or not. [¶] What's that mean? He knows I don't have status to stay in this country. [J.C.] keep just say that he wants to go to court to see the judge. [J.C.'s stepfather] paid for lawyer. [¶] I'm scare to loose my baby. If judge just care about [J.C.] has right to see baby, it's going to be a problem for me. I'm leaving [J.C.] because he's not good for my baby now." (Errors in original.)

J.C. was aware that defendant intended to leave Sacramento. On October 30, 2009, in anticipation of defendant's departure, J.C. filed a petition with the Sacramento Superior Court seeking regular visitation with V. In connection with the petition, J.C. submitted a declaration stating, in part, "While I don't want to take my baby away from the mother, I insist on being actively involved in her raising and daily life." A hearing on the petition was scheduled for November 2, 2009.

Later that day, J.C. went to defendant's house. Defendant was packing and preparing to leave. J.C. would later testify that he told defendant about the upcoming hearing date; defendant, for her part, denied that J.C. said anything about a hearing. According to defendant, J.C. was furious because she had withdrawn money from the estranged couple's joint bank account. Defendant ran to the backyard with V. and called

5

911. Police came, but no arrests were made. Shortly thereafter, defendant moved out of the house she once shared with J.C.

D. *Defendant Leaves Sacramento*

Defendant left Sacramento and drove to Los Angeles with V., arriving there on November 2, 2009. Defendant did not appear for the hearing on J.C.'s petition for visitation, which was continued to December 21, 2009. Upon arriving in Los Angeles, defendant and V. stayed at the home of J.C.'s father and Jenny for two days. They then spent several days at the home of another friend in Los Angeles, before leaving for South Korea on November 8, 2009. While in Los Angeles, defendant consulted with an attorney.

Upon arriving in South Korea, defendant and V. lived with defendant's mother. Eventually, defendant and V. moved to Jeju Island, a province of South Korea, where V. attended elementary school. Defendant lived openly in South Korea and made no effort to hide or conceal her identity.

E. *J.C. Attempts to Communicate with Defendant*

In the meantime, J.C. remained in the Sacramento area and attempted to reach defendant by phone and email. For more than four and one-half years, between November 2009 and July 2014, J.C. sent numerous emails to defendant, all of which were admitted into evidence at trial. Some of J.C.'s emails expressed love for V. and a desire to remain involved in her life. Some offered financial support and sought to reassure defendant that J.C. would not try to take V. away from her. And some praised defendant's parenting skills and empathized with defendant's situation, including her decision to leave. Others implored defendant to communicate, if not with J.C., then with authorities.

Some of J.C.'s emails, however, were overtly threatening in tone. For example, on December 12, 2009, he wrote: "Nan Hui, we need to communicate somehow or the wrath of God shall reign upon you." Elsewhere, in the same email, J.C. warned that if

6

defendant did not respond by V.'s second birthday, he would send a "very scary bounty hunter" to find her.

At trial, J.C. explained that he had once met a bounty hunter through a friend from the army. J.C. also explained that he "was desperate, so [he] was saying anything [he] possibly could to get a response." Defendant testified that she was afraid of J.C.'s friend, who worked for the bounty hunter, because he had told her and J.C. that he "liked to kill people." Defendant also indicated that she stopped checking her email after receiving J.C.'s "scary" email.

Defendant did not respond to J.C.'s emails. During the period from November 2009 through July 2014, defendant communicated with J.C. only once, in an email sent approximately six months after she left Sacramento. In the email, defendant falsely represented that she and V. were living in New Zealand. She wrote that V. was okay, and asked J.C. to repay money she believed he owed her. At trial, defendant testified that she told J.C. she was in New Zealand because she was afraid he would try to track her down or send someone to find her. However, she also explained that by 2013, she was living openly in South Korea and was no longer concerned that anyone might try to track her down.

F.    *Family Court Proceedings and Other Attempts to Maintain Contact with V.*

As noted, J.C. filed a visitation petition in late October 2009. A hearing on the petition was continued to February 9, 2010, at which time, the family court awarded physical custody to J.C. pending a further court order.

Prior to the hearing, on November 9, 2009, Jenny emailed defendant to say that she talked to J.C. about the upcoming family court proceedings. Jenny wrote: "This is only so that when you leave the country with baby [V.] he has legal rights to stay in her life and then you and he will work it out so it works for you all. He is not trying to stop you [from] leaving with the baby. He just wants to protect his own rights, and I know you understand if things were reversed you would want to do the same thing."

7

Jenny continued: "Right now, it is best if you let him serve papers and go to the hearing so this is resolved. If you do not—even if you do not get papers served, a judge will order you in violation of the court, and you could be charged with kidnapping because [J.C.] has legal rights, and even though [J.C.] does not want full custody, he would get it because you would be breaking the law."

"Please," Jenny concluded, "I am begging you, do not avoid the legal stuff because the only way you can lose baby [V.] is by avoiding it." Although defendant acknowledged having received Jenny's email, she did not respond. By then, of course, defendant was already in South Korea.

In June 2011, J.C. traveled to South Korea in hopes of seeing V. J.C. emailed defendant ahead of time to let her know he was coming. He told her he was bringing $10,000, which she could have if she would allow him to see V. and reestablish a relationship with her. Defendant did not respond, and J.C. did not see defendant or V. during his trip to South Korea. During the trial, defendant testified that she did not receive J.C.'s email.

When J.C.'s attempts to communicate with defendant failed, he reached out to the U.S. State Department. The State Department attempted to conduct a "welfare check" on V. through the U.S. Consulate in South Korea. A consulate employee emailed defendant to inquire after V.'s well-being. Defendant responded by email, letting the consulate employee know the inquiry was unwelcome.

J.C. also contacted the West Sacramento Police Department, which directed him to the Yolo County District Attorney's Child Abduction Unit. There, he met Angela Smith, an officer with the Child Abduction Unit. Smith opened an investigation on J.C.'s behalf.

Smith sent defendant a number of emails during the course of her investigation. On December 16, 2009, Smith sent defendant an email introducing herself and asking defendant to call or email as soon as possible to discuss V. Defendant did not respond.

8

During the trial, defendant testified that she was afraid Smith might be the "very scary bounty hunter" J.C. had threatened to send days earlier.

On January 6, 2010, Smith emailed defendant again, stating: "It is very important that you make contact with me. I need to know that you and the child are safe. You are not in trouble at this time, and I will not tell the father your whereabouts." Defendant responded the next day, stating: "I keep in touch with [J.C.'s] family so [he] knows my baby [V.] is fine with me so I don't understand why I got an email from you. I just care about my baby and have responsible to protect her safe as her mom. That's why I want him to stay away from us." (Errors in original.)

Defendant and Smith exchanged several more emails in the ensuing weeks. In her emails, Smith repeatedly urged defendant to contact her, noting that the hearing on J.C.'s petition for visitation was set for February 9, 2010. In her responses, defendant insisted on communicating via email. Defendant did not disclose that she was in South Korea. To the contrary, she intimated that she was still in the United States.

When defendant indicated that she might not be able to appear for the hearing in person, Smith provided her with contact information for the court so she could make arrangements to appear by telephone. Smith also emailed defendant copies of the petition and related orders from the family court proceedings. Defendant did not appear telephonically, and did not respond to Smith's attempts to follow up.

Smith eventually contacted Interpol, which placed defendant's name on a lookout list so that the Child Abduction Unit would be notified if she attempted to reenter the United States.

G.     *Defendant Returns to the United States*

In June 2014, the State Department notified Smith that defendant had applied for a 90-day visa to reenter the United States. The application indicated that defendant intended to reenter the United States in Honolulu, Hawaii. During the trial, defendant explained that she wanted to return to the United States so that V., an American citizen,

9

could attend an elementary school in Honolulu. Smith asked the State Department to grant the application.

Defendant and V. flew to Honolulu on July 29, 2014. Defendant was arrested as she attempted to pass through customs. V. was taken to a children's center in Honolulu and reunited with J.C. The reunion was bittersweet, as V., then six years old, spoke no English and could not communicate with J.C., who does not speak Korean. With the help of bilingual therapists, V. came to understand that J.C. was her father. V. had previously been told by defendant that she did not have a father.

J.C. and V. returned to Sacramento. On August 5, 2014, the family court awarded sole legal and physical custody of V. to J.C., with no visitation for defendant.

### H.     *The Charges and Plea*

On July 29, 2014, the Yolo County District Attorney filed a single-count complaint charging defendant with felony taking, enticing away, keeping, withholding or concealing a child in violation of section 278.5, subdivision (a). The complaint alleges the violation occurred between October 30, 2009, and July 29, 2014. The complaint further alleges that defendant maliciously deprived a lawful custodian of a right to custody and visitation. On October 14, 2014, the district attorney filed an information repeating the allegations of the earlier complaint. On October 17, 2014, defendant entered a plea of not guilty.

### I.     *Defendant's First Trial*

Defendant was tried by jury in December 2014. After the close of evidence, the jury was instructed on the elements of child custody deprivation with CALCRIM No. 1251.[2] The jury was also instructed on an affirmative defense to child custody

---

[2] The standard version of CALCRIM No. 1251 provides in pertinent part:

> "The defendant is charged [in Count One] with depriving someone else of the right to (custody/[or] visitation) [in violation of Penal Code section 278.5].

10

deprivation with CALCRIM No. 1252.[3]  The first trial ended in a hung jury, leading to a mistrial.

---

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant (took[,]/ [or] enticed away[,]/ [or] kept[,]/ [or] withheld[,]/ [or] concealed) a child;

"2. The child was under the age of 18;

"AND

"3. When the defendant acted, (he/she) maliciously (deprived a lawful custodian of (his/her/its) right to custody/ [or] deprived a person of a lawful right to visitation).

"Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else."

[3]  The standard version of CALCRIM No. 1252 provides in pertinent part:

"The defendant did not maliciously deprive a (lawful custodian of a right to custody/ [or] person of a right to visitation) if the defendant:

"1. Had a right to custody of the child when (he/she) abducted the child;

"2. Had a good faith and reasonable belief when abducting the child that the child would suffer immediate bodily injury or emotional harm if left with the other person;

"3. Made a report to the district attorney's office in the county where the child lived within a reasonable time after the abduction;

"4. Began a custody proceeding in an appropriate court within a reasonable time after the abduction;

"AND

"5. Informed the district attorney's office of any change of address or telephone number for (himself/herself) and the child.  [¶] . . . [¶]

11

*J.      Defendant's Second Trial*

Defendant was tried again in February 2015.  During the prosecution's case-in-chief, the prosecutor examined J.C. at length about his tumultuous relationship with defendant.  Among other things, the prosecutor elicited testimony about the estranged couple's most serious fights, including their violent altercation on October 18, 2009.  Defendant, for her part, was questioned at length about her state of mind at the time she left the United States with V. for South Korea.  Defendant denied knowing that J.C. wanted the family court to determine custody of V., but acknowledged knowing that J.C. wanted some kind of relationship with his daughter.  In response to questions from the jury, defendant testified that it never occurred to her that she was not supposed to leave the United States without a custody or visitation plan with J.C.  Defendant also testified that the first time she realized she was in trouble was upon being arrested in Honolulu.

---

"[One way a child may suffer *emotional harm* is if he or she has a parent who has committed domestic violence against the parent accused of abducting the child. Acts of 'domestic violence' include, but are not limited to (1) sexual assault; (2) causing or attempting to cause bodily injury, either intentionally or recklessly; or (3) causing a person to reasonably fear imminent serious bodily injury to himself or herself or another.]

"The report to the district attorney must include the defendant's name, the defendant's or child's current address and telephone number, and the reasons the child was abducted.

"A reasonable time within which to make a report to the district attorney's office is at least 10 days from when the defendant took the child.

"A reasonable time to begin a custody proceeding is at least 30 days from the time the defendant took the child.

"The People have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a (lawful custodian of a right to custody/ [or] person of a right to visitation).  If the People have not met this burden, you must find the defendant not guilty of _____*<insert crime charged>*."

12

### 1. The Prosecution's Expert

During the prosecution's case-in-chief, the prosecution called Barbara Enriquez, a retired Deputy District Attorney for Yolo County. Enriquez, a thirty-year veteran of the District Attorney's Office, worked for the Child Abduction Unit from 2009 through 2013. Enriquez was qualified as an expert on the work of the Child Abduction Unit and various aspects of family law, including the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) and the Hague Convention on the Civil Aspects of International Child Abduction. The prosecutor's direct examination covered a range of topics, from the statutory ground rules of parental custody to the mechanics of personal service and procedures for retrieving abducted children. As relevant here, the prosecutor's direct examination also touched on the subject of domestic violence. The following colloquy took place:

"[THE PROSECUTOR]: And what if someone is a victim of domestic violence? Is [*sic*] there particular laws in place to protect them?

"[ENRIQUEZ]: Yes. Our office often deals with, you know, parents who are fleeing domestic violence, and so sometimes they'll call us, or they'll come to our office, and we have them fill out what's called a good cause form, and they give us their information, where they are, and we keep that confidential. [¶] . . . [¶]

"[THE PROSECUTOR]: And so is there a specific law which lays—in California which lays out what the duties are of a person who conceals a child but conceals the child either because the child or the parent is being abused by the other parent?

"[ENRIQUEZ]: Yes, there is a specific Penal Code Section, 278.7, that provides for that."

When the prosecutor asked Enriquez to elaborate on section 278.7, defense counsel objected on the grounds that the testimony amounted to a legal conclusion. The prosecutor countered, "I'm not arguing whether [section 278.7] applies to the case. I'm asking Ms. Enriquez to tell the jury what the law is in place for people who have a

13

situation where they're fleeing from domestic violence. [¶] I'm not sure the facts of this case will ultimately show that or not but there—I want to show that there is a law in place to cover that situation."

The trial court allowed the testimony, and Enriquez continued: "So what the law requires is that they notify the district attorney's office within ten—ten days—as soon as possible but within ten days where they are and the information about themselves and the other parent and the children, and then they're supposed to keep us notified if there's a change of address or a change of phone number. [¶] Then within a reasonable amount of time, and I believe statutorily within 30 days, they need to file court paperwork to start custody and visitation proceedings."[4]

### 2.    *The Defense Expert*

The defense offered its own expert, Susun Kim, Executive Director of the Contra Costa County Family Justice Center. Kim, an attorney, was qualified as an expert on the impact of domestic violence on victims, particularly Korean women. Kim was also qualified as an expert in the areas of family law and the transliteration of Korean names.

On direct examination, Kim testified that victims of domestic violence are often reluctant to report abuse to authorities. Kim explained that Korean women are especially reluctant to report abuse, particularly when they are not proficient in English. Kim also testified about methods for effecting service of temporary custody orders and methods for retrieving children from South Korea.

On cross-examination, the prosecutor asked Kim about section 278.7. Defense counsel objected on the grounds that the question was beyond the scope of the direct examination. The objection was sustained. Moments later, the prosecutor asked Kim how she would counsel someone who was concealing a child to protect them from

---

[4] We express no opinion as to the correctness of Enriquez's interpretation of the statute.

14

domestic violence. Kim responded that she would advise the person to file a "good-faith report" with the district attorney's office and commence a custody action. When the prosecutor attempted to follow up, defense counsel objected that the follow up questions were beyond the scope of the direct examination. This time, the trial court overruled the objection, stating, "You qualified her as an expert witness in the use of the family law procedure and domestic violence in general, so at this point it's fair game." The prosecutor then asked Kim a series of questions regarding section 278.7's reporting requirements. As we shall discuss, there was no evidence that defendant complied with these requirements.

*K.*     *Jury Instructions*

On February 23, 2015, the trial court met briefly with counsel to identify jury instructions that might require further discussion. The trial court identified CALCRIM No. 1252 which, as noted, articulates a defense to child custody deprivation. The trial court stated: "1252. I will give it if there is evidence to support this defense. If there's no evidence sufficient to support all elements of the defense, I will not give it."

The prosecution rested on February 25, 2015. The defense called Kim as its first witness on the same day. After Kim completed her testimony, the trial court held a further hearing to discuss jury instructions. During the hearing, the parties disagreed as to whether child custody deprivation under section 278.5 is a specific intent crime, which would require the trial court to instruct the jury with CALCRIM No. 251, or a general intent crime, which would require the trial court to instruct the jury with CALCRIM No. 250. The trial court initially agreed with defendant that section 278.5 is a specific intent crime. However, the trial court observed that CALCRIM No. 1251 articulates alternative definitions of the required state of mind. (CALCRIM No. 1251 ["Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else"].)

15

The trial court invited the prosecution to proceed solely on the theory that defendant intentionally performed a wrongful act, and withdraw any theory that she acted with the unlawful intent to disturb, defraud, annoy, or injure someone else. The prosecutor initially expressed a desire to strike the words "or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else" from CALCRIM No. 1251, and proceed with a modified instruction. Moments later, however, the prosecutor indicated that he would research the trial court's proposal and let the trial court know how he wished to proceed.

The next day, the prosecution filed a motion urging the trial court to instruct the jury with CALCRIM No. 1252. The motion acknowledged that "the defense is not claiming a statutory defense pursuant to [section] 278.7." Nevertheless, the prosecution argued that "the defense is raising a defense that is within the same spirit of this statute, and therefore, the People should be allowed to present CALCRIM [No.] 1252 to the jury to show the defendant did not do what she legally was required to do."

The trial court and counsel discussed jury instructions again on the afternoon of February 26, 2015, after defendant, the last witness called for the defense, had completed her testimony on direct examination. During the hearing, the trial court indicated that the court would instruct the jury with CALCRIM No. 250 (as opposed to CALCRIM No. 251) and a modified version of CALCRIM No. 1251. The trial court explained: "The People have chosen not to proceed on one of the theor[ies] of malice, so that's been stricken."

The trial court then introduced the subject of CALCRIM No. 1252. The following colloquy took place:

"[THE TRIAL COURT]: 1252—and this is one, [defense counsel], you object to?

"[DEFENSE COUNSEL]: I do object to it, yes.

16

"[THE TRIAL COURT]:   You may state your objection on the record now, if you wish.

"[DEFENSE COUNSEL]:  The CALCRIM No. 1252 refers to the codified defense in [section] 278.7, I believe it is, and that is not a defense that is being proffered by the—by the defendant at trial.  I'm asking that it not be given.  [¶]  It would be the functional equivalent of giving an instruction for mistake of fact when that's not an issue at trial.  There aren't the support—there aren't supporting facts to support this defense.

"Furthermore, it's confusing to the jury.  What it does is it essentially shifts the burden onto the defense.  What it's doing here is it's—as it did in the first trial, is it—it sets up an equation where the jury is going to believe that this is the only defense, and if this defense can't be met, then my client doesn't have an argument that she didn't have the—that the requisite elements weren't met.

"[THE TRIAL COURT]:   It may, in fact, be the only defense permitted by law. The People still have to prove every element of the crime.

"[DEFENSE COUNSEL]:  Right, but this sets up an equation where the jury is led to believe that the statutory defense is the only defense in this case.  [¶]  It's exactly what happened in the first trial.  We had to reargue it for that very reason.  The jury came back with a question as far as if these elements weren't met, which they aren't met, there aren't supporting facts to support this jury instruction, and then we had to basically try to untangle the situation, which, I think, is what led ultimately to a mistrial in the first place.

"[THE TRIAL COURT]:   Well, this instruction has to be given in a couple of circumstances.  The court has a sua sponte duty to give this instruction in the following circumstances:  One, if defense is relying on this defense.  [¶]  Clearly, your argument right now is defense is not relying on this defense.

"[DEFENSE COUNSEL]:  That is correct."

The trial court then observed that a sua sponte duty to instruct the jury with CALCRIM No. 1252 would arise "if there is substantial evidence supporting the defense,

17

and the defense is not inconsistent with the defendant's theory of the case." Defense counsel argued that no evidence supported the application of CALCRIM No. 1252. The trial court responded, "Oh, of course. You haven't met all the elements of the defense. No question about it." Nevertheless, the trial court found there was "more than a modicum of evidence" to support the existence of two of the five elements of the defense. Accordingly, the trial court concluded that substantial evidence supported the application of CALCRIM No. 1252.

Having so concluded, the trial court next considered whether the defense was inconsistent with defendant's theory of the case. The trial court invited the prosecutor to address the issue, and the following colloquy took place:

"[THE PROSECUTOR]: The defense put this into play by the evidence that they presented. They actually put on a . . . domestic violence expert. They are claiming that she had in her mind a good faith and reasonable belief, however they want to couch it.

"If the defense was able to put on this type of evidence when their client didn't follow the statute, then the statute would have no force and effect whatsoever. If [defense counsel] hadn't wanted this statute and this jury instruction to come into play, he would have simply put on information that his client left the country, nothing about her reasoning being domestic violence or threat to the child being the reasons for it. None of that evidence would have—should have come in if that is not his theory of the case.

"[THE TRIAL COURT]: I completely agree with the People on this. You can't raise the issue of threat of domestic violence as you have done and then just leave it out there. This is the only way a person can take advantage of the defense of I had to leave because I was afraid of violence to me or my child.

"If you raise the issue as has been done in this case, then this has to be instructed. The jury has to know that this is the only way that defense is viable.

"[DEFENSE COUNSEL]: Your Honor, that is not the case. It's not the first trial's logic at all. In fact, we all, the court, the People, and the defense, were all on the

18

same page as far as this just being one of many possible defenses, that domestic violence—

"[THE TRIAL COURT]:   What other defenses are you raising?

"[DEFENSE COUNSEL]:  I'm raising a defense that the elements haven't been met.

"[THE TRIAL COURT]:   That's not a defense.  That's a challenge to the People's case.  They do have to meet all elements of the crime beyond a reasonable doubt.

"I'm asking you are you raising any other, quote, 'defenses'?

"[DEFENSE COUNSEL]:  I'm not raising a defense pursuant to [section] 278.7.

"[THE TRIAL COURT]:   Then what was all the evidence you presented about domestic violence?  What was that all about?

"[DEFENSE COUNSEL]:  That was about my client's state of mind.  That's what it was about and the reasons for—

"[THE TRIAL COURT]:   We've already established—

"[DEFENSE COUNSEL]:  And the reasons for her conduct.

"[THE TRIAL COURT]:   Well, I'm satisfied that the Court has to give the instruction [for CALCRIM No.] 1252 as the evidence has been presented in this case.  It is not inconsistent with the defendant's theory of the case.

"I've already determined that the concept of malicious deprivation simply means the intentional doing of a wrongful act, and it's that simple."

Defense counsel then requested a pinpoint instruction stating that CALCRIM No. 1252 "is just one of many possible ways to show that the defendant did not act maliciously.  It is not the only exclusive way to show that the defendant did not have the required mental state."  When the trial court asked why defense counsel failed to request a pinpoint instruction earlier, counsel responded, "I did not believe that [CALCRIM No. 1252] would be given."  The trial court rejected the proposed pinpoint instruction as

19

unnecessary, noting that CALCRIM No. 1252 provides, "The People have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a lawful custodian of a right to custody or a right to visitation. If the People have not met this burden, you must find the defendant not guilty."

The trial court instructed the jury on February 27, 2015. As expected, the trial court instructed the jury with CALCRIM No. 250, a modified version of CALCRIM No. 1251 ("Someone acts maliciously when he or she intentionally does a wrongful act"), and CALCRIM No. 1252. The trial court also instructed the jury with CALCRIM No. 200, which provides in part, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

L.      *Closing Arguments*

During closing argument, the prosecutor referenced the incidence of domestic violence between defendant and J.C., stating, "You heard about domestic violence during this trial, and it's an important issue. We need to recognize and make provisions for situations, especially in family law, where there's domestic violence, and the law does that." The prosecutor did not expressly mention CALCRIM No. 1252.

Defense counsel, in turn, characterized CALCRIM No. 1252 as a "red herring," stating, "We have five different requirements here. The last three of which clearly weren't met. What the design here, I believe, is to get you into an equation where you think this is the only defense. That's not true. [¶] If you go on and read the rest of CALCRIM [No.] 1252, you'll see where it says that the People, and I'll insert the word 'still,' have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a lawful custodian of a right to custody or a right to visitation. If the People have not met this burden, you must not find—you must find the defendant not guilty."

20

In his rebuttal argument, the prosecutor responded, "There [were] so many things that she could have done without going to the extent she did that didn't allow the dad to ever see or hear about his child for five years. That is intentionally doing a wrong act. She had other good intentions at the same time, but she also knew it was wrong to deprive [J.C.]. She just decided her other intents were more important to her, and the law doesn't allow that. It's a wrongful intent, and if you don't do what the law allows you to do under [section] 278.7, which is I'm fleeing for these reasons, here's my address and phone number, neutral party, and, yes, I will get into court, and I'll keep you apprised of my address, then that's a legal defense. Here the only legal defense is I didn't know I was doing something wrong."

*M.     Jury Deliberations*

The jury began deliberations on the afternoon of Friday, February 27, 2015. They deliberated for 12 minutes and were then released for the weekend. Deliberations resumed on Monday, March 2, 2015. At 10:35 a.m., the trial court received a note from the jury. The note read: "According to CALCRIM [No.] 1252[:] [¶] Regarding the 5 items described to be not malicious, do all 5 items have to be met to convict? [¶] In other words if we believe item [number] 2 is in question can that alone prove to be not malicious?"[5]

The trial court responded as follows: "CALCRIM [No.] 1252 is a defense to the crime charged in this case. As to CALCRIM [No.] 1252, the 5 items listed are joined by the word 'AND,' thus all 5 items must be found for the defense to apply. The People have the burden of proving guilt of the crime charged beyond a reasonable doubt."

---

[5] As noted, the second element of CALCRIM No. 1252 addresses whether the defendant "[h]ad a good faith and reasonable belief when abducting the child that the child would suffer immediate bodily injury or emotional harm if left with the other person." (CALCRIM No. 1252.)

Shortly thereafter, the trial court received a second note from the jury. The note read: "In this case if we don't believe the taking of the child is malicious but the withholding is does the withholding of the child [constitute] grounds enough to determine guilt?"

The trial court responded as follows: "Guilt can only be found if the People prove each element of the crime beyond a reasonable doubt. Element number one of the charged crime is presented with the use of the word 'or' as 'the defendant took, kept, withheld, or concealed a child'—accordingly, element number one can be proved if any of the acts (took, kept, withheld, or concealed a child) is shown beyond a reasonable doubt."

Shortly thereafter, the trial court received a third note from the jury. The trial court responded. The jury's note and the trial court's responses read as follows:

"Question: Is the 5 element statutory defense the only defense available in this case?

"Response: The 5 element defense indicated by CALCRIM [No.] 1252 is a statutory defense to the crime alleged in CALCRIM [No.] 1251. The People have the burden of proving beyond a reasonable doubt each element of the crime charged in this case. If the People have not met this burden, you must find the defendant not guilty.

"Question: Is there a definition of wrongful in the code?

"Response: As I instructed you in CALCRIM [No.] 200, words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings.

"Question: Shouldn't we have a copy of [section] 278.5[, subdivision] (a)?

"Response: You are to decide this case only on the evidence presented to you in the courtroom during the trial and the instructions I have given you. All the elements of the crime charged in this case are addressed and defined in CALCRIM [No.] 1251."

Several hours later, the trial court received a fourth note from the jury. The note read: "One of the jurors is feeling she cannot morally mak[e] a decision in this case. [¶] What do we do?"

The trial court convened the jury and the parties. The subject of the note was identified as Juror No. 5. The trial court then directed the jury to return to the jury room and questioned Juror No. 5. The following colloquy took place:

"[THE TRIAL COURT]:  There are some jurors who feel they cannot morally judge another person and are unable to make a decision on guilt or innocence. [¶] Do you feel you are in that category?

"JUROR NO. [5]:  Not categorically.

"[THE TRIAL COURT]:  Well, explain. [¶] . . . [¶]

"JUROR NO. [5]:  In this case I feel—you know, you asked me in a broad sense but I—when we were sitting—with the way the law is written, what is asked of me, I feel it is unjust and that it would compromise who I am as a human being to—

"[THE TRIAL COURT]:  Are you telling me that you cannot follow the law as I've instructed you?

"JUROR NO. [5]:  I guess I am. I guess I am."

Later, the trial court asked Juror No. 5, "So earlier when we chatted you had indicated that ultimately you cannot follow the law as I instructed; is that correct?" Juror No. 5 responded, "Yes." Still later, the trial court asked Juror No. 5, "When you say that you cannot follow the law as I instruct you, is that still your position?" Juror No. 5 responded, "I can probably answer that question by saying no if [I] come up with a convoluted justification, but I don't want to do that, so I'm honest and so I guess I'd have to say yes." Following further discussion, Juror No. 5 returned to the jury room and the trial court discussed the matter with counsel. Despite strenuous objections and argument from defense counsel, the trial court concluded that Juror No. 5 was unable to follow the

23

law as instructed.  Accordingly, the trial court reconvened the jury, excused Juror No. 5, and seated an alternate.  The jury was released for the evening a short time later.

The newly-constituted jury began deliberations the following day, reaching a verdict in a little over an hour.

*N.*     *Verdict and Sentence*

The jury returned its guilty verdict on the charge of child custody deprivation on March 3, 2015.  Defendant filed a motion for a new trial, raising many of the same arguments advanced on appeal.  The trial court denied the motion.

During the sentencing hearing, the trial court exercised its discretion to reduce defendant's conviction to a misdemeanor (§ 17, subd. (b)) and sentenced defendant to 175 days in county jail, which was already satisfied by time served.  The trial court also sentenced defendant to three years of summary probation.

Defendant filed a timely notice of appeal.

## II.  DISCUSSION

*A.*     *Instructional Errors*

Defendant contends the trial court made four related errors in instructing the jury. First, she contends the trial court erred by instructing the jury with CALCRIM No. 250, rather than CALCRIM No. 251.  Second, defendant contends the trial court erred by instructing the jury with CALCRIM No. 1252 over her objection.  Third, defendant contends the trial court failed to properly respond to the jury's questions regarding the relationship between sections 278.5 and 278.7.  Fourth, defendant contends the trial court improperly refused to give a pinpoint instruction explaining that section 278.7 represents one of many possible defenses to child custody deprivation under section 278.5.  We address these contentions in order, pausing first to consider the applicable standard of review and relevant statutory background.

24

*1.     Standard of Review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  The pertinent inquiry is whether the instructions as a whole fully and fairly set forth the applicable law.  (*Ibid.*)  In making that determination, we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment.  (*Ibid.*)

*2.     Statutory Background*

Defendant was convicted of child custody deprivation in violation of section 278.5, subdivision (a).  Section 278.5, subdivision (a) applies to "[e]very person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody."[6]

By its terms, section 278.5, subdivision (a) requires that the person act "maliciously."  Our Supreme Court has explained that section 278.5 incorporates the definition of malice set forth in section 7, subdivision (4), which provides:  "The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."  (See *People v. Neidinger* (2006) 40 Cal.4th 67, 79 (*Neidinger*).)

The trial court instructed the jury on the elements of child custody deprivation pursuant to CALCRIM No. 1251 as follows:

---

[6] Section 278.5, subdivision (a) provides in full:  "Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation, shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment."

"The defendant is charged in Count 1 with depriving someone else of the right to custody or visitation in violation of [section] 278.5. To prove that the defendant is guilty of this crime, the People must prove that:

"One, the defendant took, kept, withheld or concealed a child; two, the child was under the age of 18[;] and, three, when the defendant acted, she *maliciously* deprived a lawful custodian of his right to custody or deprived a person of a lawful right to visitation." (Italics added.)

The standard version of CALCRIM No. 1251 defines the term "maliciously" as follows: "Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else." At the trial court's suggestion, the jury was instructed with a modified version of CALCRIM No. 1251 as follows: "Someone acts maliciously when he or she intentionally does a wrongful act."

Section 278.7 establishes a defense to criminal liability under section 278.5. Section 278.7, subdivisions (a) through (d) provides in pertinent part:

"(a) Section 278.5 does not apply to a person with a right to custody of a child who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child.

"(b) Section 278.5 does not apply to a person with a right to custody of a child who has been a victim of domestic violence who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child. 'Emotional harm' includes having a parent who has committed domestic violence against the parent who is taking, enticing away, keeping, withholding, or concealing the child.

"(c) The person who takes, entices away, keeps, withholds, or conceals a child shall do all of the following:

26

"(1) Within a reasonable time from the taking, enticing away, keeping, withholding, or concealing, *make a report to the office of the district attorney of the county* where the child resided before the action. The report shall include the name of the person, the current address and telephone number of the child and the person, and the reasons the child was taken, enticed away, kept, withheld, or concealed.

"(2) Within a reasonable time from the taking, enticing away, keeping, withholding, or concealing, *commence a custody proceeding* in a court of competent jurisdiction consistent with the federal Parental Kidnapping Prevention Act (Section 1738A, Title 28, United States Code) or the Uniform Child Custody Jurisdiction Act (Part 3 (commencing with Section 3400) of Division 8 of the Family Code).

"(3) *Inform the district attorney's office* of any change of address or telephone number of the person and the child.

"(d) For the purposes of this article, a reasonable time within which to make a report to the district attorney's office is at least 10 days and a reasonable time to commence a custody proceeding is at least 30 days." (Italics added.)

CALCRIM No. 1252 articulates the defense described in section 278.7. The trial court instructed the jury with CALCRIM No. 1252 as follows:

"The defendant did not maliciously deprive a lawful custodian of a right to custody or a right to visitation if the defendant:

"One, had a right to custody of the child when she abducted the child; two, had a good faith and reasonable belief when abducting the child that the child would suffer immediate bodily injury or emotional harm if left with the other person; three, made a report to the [d]istrict [a]ttorney's [o]ffice in the county where the child lived within a reasonable time after the abduction; four, began a custody proceeding in an appropriate court within a reasonable time after the abduction[;] and, five, informed the [d]istrict [a]ttorney's [o]ffice of any change of address or telephone number for herself and the child."

27

The trial court further instructed the jury that, "The People have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a lawful custodian of a right to custody or a right to visitation. If the People have not met this burden, you must find the defendant not guilty."

This court considered the scope of section 278.7's "good cause" defense in *People v. Mehaisin* (2002) 101 Cal.App.4th 958 (*Mehaisin*). There, the defendant was charged with child custody deprivation after he failed to return his children to their mother, their lawful custodian, following a scheduled visitation. (*Id.* at p. 960.) During the trial, the defendant moved in limine to present a section 278.7 defense based on evidence that he withheld the children to protect them from their mother's brother, a drug user who lived in the same home. (*Mehaisin, supra,* at pp. 961- 962.) The trial court ruled that the defendant was not entitled to present the defense because he did not comply with section 278.7's reporting and custody proceeding provisions. (*Mehaisin, supra,* at p. 962.)

This court affirmed, holding that the defendant "was not entitled to a defense under section 278.7, subdivision (a) or (b), because he was not a person 'with a right to custody of a child' within the meaning of those subdivisions." (*Mehaisin*, *supra*, 101 Cal.App.4th at p. 963.) The court also opined that the defendant "was not entitled to a section 278.7 defense because he did not report the taking to the Sacramento District Attorney and did not commence a custody proceeding in a court of competent jurisdiction. (§ 278.7, subd. (c).)" (*Id.* at p. 965.)

The court recognized that, "Section 278.7 is silent as to whether a person claiming the defense must comply with its reporting provisions, or in other words, whether the reporting provisions are conditions of the statutory defense." (*Mehaisin*, *supra*, 101 Cal.App.4th at p. 965.) However, the court determined that section 278.7 was based on the common law necessity defense, which requires that the person committing the crime report to the proper authorities upon reaching a place of safety. (*Mehaisin, supra,* at p. 965.) The court found nothing in section 278.7's legislative history to suggest that the

28

Legislature intended to change the common law in this respect. (*Mehaisin, supra,* at p. 965.) Accordingly, the court concluded that a person claiming a "good cause" defense under section 278.7, subdivision (a) must comply with the reporting and custody proceeding provisions set forth in subdivisions (c) and (d). (*Mehaisin, supra,* at p. 965.)

Our Supreme Court considered the relationship between section 278.5 and 278.7 in *Neidinger.* There, the defendant removed his two children from their mother's home in California to Nevada and was charged with two counts of child custody deprivation under section 278.5. (*Neidinger*, *supra*, 40 Cal.4th at p. 71.) At trial, the defendant claimed he had a reasonable and good faith belief that removal of the children from their mother's care was necessary for their physical and emotional well-being. (*Id*. at pp. 71-72.) The trial court instructed the jury on the "good cause" defense under section 278.7, subdivision (a). (*Neidinger*, *supra*, at pp. 71-72.) As part of the instruction, the trial court told the jury that the defendant had the burden of proving the facts necessary to establish the defense by a preponderance of the evidence. (*Id.* at p. 72.) The jury found defendant guilty on both counts. (*Ibid.*) This court reversed the conviction, and the Supreme Court granted review. (*Ibid.*)

The court began by restating the "well settled, indeed, virtually axiomatic" proposition that "the prosecution has the burden of proof beyond a reasonable doubt." (*Neidinger*, *supra*, 40 Cal.4th at p. 72.) Thus, the court observed, "the prosecution had the burden of proving beyond a reasonable doubt every element of the crime stated in section 278.5, subdivision (a)." (*Ibid.*) Nevertheless, the court continued, "it is constitutionally permissible to place on the defendant the burden of proving affirmative defenses by a preponderance of the evidence, as long as the defendant is not required to negate an element of the offense." (*Ibid.*) Accordingly, the court explained, the question presented was "how section 278.7[, subdivision ](a)'s belief defense interacts with section 278.5." (*Id.* at p. 73.) "Specifically," the court elaborated, "we must decide who has the burden of proof regarding this belief, and what that burden is." (*Ibid.*)

29

Having framed the issues, the court first turned to the question of who bears the burden of proof. (*Neidinger*, *supra*, 40 Cal.4th at p. 74.) Applying the rule of convenience and necessity, the court found that, "The facts underlying section 278.7[, subdivision ](a)'s belief requirement are peculiarly within defendant's personal knowledge, and it would be relatively difficult or inconvenient for the prosecution to prove their nonexistence." (*Ibid.*) By contrast, the court continued, "It would not be unduly harsh or unfair to place the burden of proving those facts on defendant." (*Ibid.*) Accordingly, the court concluded that section 278.7 "is an affirmative defense that the defendant must raise." (*Neidinger*, *supra*, at p. 75.)

Having concluded that the defendant bears the initial burden, the court next considered the applicable standard of proof. (*Neidinger*, *supra*, 40 Cal.4th at p. 75.) Relying on the discussion of Evidence Code section 501 in *People v. Mower* (2002) 28 Cal.4th 457, the court explained that, " 'when a statute allocates the burden of proof to a defendant on any fact *relating to his or her guilt*, the defendant is required merely to raise a reasonable doubt as to that fact.' " (*Neidinger*, *supra*, at p. 75, citing *Mower, supra,* at p. 479.) By contrast, " '[w]hen a statute allocates the burden of proof to a defendant as to a fact collateral to his or her guilt, however, the defendant may be required to prove that fact by a preponderance of the evidence.' " (*Neidinger*, *supra*, at p. 76.)

Applying these principles, the court compared and contrasted section 278.5's requirement that the defendant act "maliciously" with section 278.7's requirement that the defendant have a "good faith and reasonable belief." (*Neidinger, supra,* 40 Cal.4th at p. 78.) The court observed, "The two concepts are not identical. But, in effect, the section 278.7[, subdivision ](a) defense provides a specific example of when the person does not act maliciously." (*Id.* at p. 79.) The court continued, "The malice requirement and the section 278.7[, subdivision ] (a) defense are intertwined, not entirely separate. Section 278.7[, subdivision ](a) is not entirely collateral to the elements of the offense but relates to the element of malice and thus to the person's guilt." (*Ibid.*)

30

Having concluded that the "good cause" defense relates to an element of the crime of child custody deprivation, the court further concluded that, "a defendant need only raise a reasonable doubt whether the facts underlying the section 278.7[, subdivision ](a) defense exist." (*Neidinger*, *supra*, 40 Cal.4th at p. 79.) Accordingly, the court concluded the trial court prejudicially erred by requiring the defendant to prove the facts underlying the section 278.7, subdivision (a) defense by a preponderance of the evidence, even under the state law standard for error enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 835-836. (*Neidinger*, *supra*, at p. 79.)

### 3.    Did Neidinger Overrule Mehaisin?

Defendant argues that *Neidinger* implicitly overruled *Mehaisin,* such that a defendant who has not complied with the reporting and custody proceeding requirements set forth in subdivisions (c) and (d) of section 278.7 can still assert a "good cause" defense under section 278.7, subdivision (a). Defendant bases her argument on the court's observation that, "in effect, the section 278.7[, subdivision ](a) defense provides a specific example of when the person does not act maliciously." (*Neidinger*, *supra*, 40 Cal.4th at p. 79.)[7] We reject defendant's argument for several reasons.

First, *Neidinger* expressly declined to address the question answered by *Mehaisin*. (*Neidinger*, *supra*, 40 Cal.4th at p. 73, fn. 4.) The *Neidinger* court noted the issue in a footnote. (*Ibid.*) After setting forth the text of section 278.7, subdivisions (c) and (d), the

---

[7] Defendant also finds support for her theory that *Neidinger* implicitly overruled *Mehaisin* in CALJIC 9.71.5, which purports to articulate the "good cause" defense under section 278.7. According to defendant, the CALJIC committee originally included section 278.7's reporting and custody proceeding requirements in CALJIC 9.71.5, but deleted them following the court's decision in *Neidinger.* We note that " 'jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) In any case, we disagree with the CALJIC committee's interpretation of *Neidinger* for the reasons stated in the text.

31

court stated: "We express no opinion regarding the meaning of these other subdivisions or how they interrelate with section 278.7[, subdivision ](a). (See [] *Mehaisin*[, *supra*,] 101 Cal.App.4th [at pp.] 962-965.)" (*Ibid.*) Thus, *Neidinger* does not address the relationship between section 278.7, subdivision (a), on the one hand, and subdivisions (c) and (d), on the other, and cannot be viewed as a repudiation of this court's opinion in *Mehaisin*. (*Mares v. Baughman* (2001) 92 Cal.App.4th 672, 679 ["Cases do not stand for propositions that were never considered by the court"].)

Second, defendant's argument ignores the context in which the court's observation was made. As previously discussed, *Neidinger* was concerned with the allocation of the burden of proof under section 278.7, subdivision (a), and what that burden of proof should be. (*Neidinger*, *supra*, 40 Cal.4th at pp. 75-76.) In examining the interplay between the statutes, the *Neidinger* court focused on whether a good faith and reasonable belief under section 278.7, subdivision (a) relates to the element of malice under section 278.5, such that the defendant need only raise a reasonable doubt regarding the facts underlying the defense, or whether such a belief is collateral to the defendant's guilt or innocence, such that the defendant may be required to prove the fact by a preponderance of the evidence. (*Neidinger*, *supra*, at pp. 75-76.) The observation that, "in effect, the section 278.7[, subdivision ](a) defense provides a specific example of when the person does not act maliciously," was offered as support for the court's conclusion that section 278.7, subdivision (a) "is not entirely collateral to the elements of the offense but relates to the element of malice and thus to the person's guilt." (*Neidinger*, *supra*, at p. 79.) The observation cannot reasonably be interpreted to mean that a good faith and reasonable belief under section 278.7, subdivision (a) operates as a complete defense to the crime of child custody deprivation under section 278.5, particularly in light of the footnote discussed above.

Third, defendant's interpretation of section 278.7, subdivisions (a) and (b) would turn subdivisions (c) and (d) into mere surplusage. If, as defendant suggests, a person

32

claiming a "good cause" defense under section 278.7, subdivisions (a) or (b) need only raise a reasonable doubt as to her good faith belief, compliance with subdivision (c) and (d)'s reporting and custody proceeding requirements would be unnecessary. Such an interpretation would render subdivisions (c) and (d) superfluous, in violation of the principle that, "when interpreting a statute, significance should be given to every word, phrase, and sentence where possible." (*People v. Sanders* (2012) 55 Cal.4th 731, 739; see *City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 55 ["We ordinarily reject interpretations that render particular terms of a statute mere surplusage, instead giving every word some significance"].)

Fourth, defendant's interpretation ignores section 278.7's legislative history. As previously discussed, another panel of this court examined the applicable legislative history in *Mehaisin* and concluded that section 278.7 was modeled on the common law defense of necessity, which requires that the person committing the crime report to the proper authorities upon reaching a position of safety. (*Mehaisin*, *supra*, 101 Cal.App.4th at p. 965.) Nothing in *Neidinger* undermines *Mehaisin*'s conclusion that section 278.7's common law antecedent requires reporting.

Finally, defendant's theory that a good faith and reasonable belief under section 278.7, subdivision (a) operates as a complete defense to child custody deprivation under section 278.5 does violence to *Neidinger*'s definition of malice. As noted, *Neidinger* concluded that section 278.5 incorporates the definition of malice set forth in section 7, subdivision (4), which provides: "The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." Our Supreme Court has explained that section 7, subdivision (4) describes two types of malice: "malice in fact," which "consists of actual ill will or intent to injure" and "malice in law," which "may be 'presumed' or 'implied' from the intentional doing of the act without justification or excuse or mitigating circumstances." (*In re V.V.* (2011) 51 Cal.4th 1020, 1028.) As the Supreme Court

33

explained in *People v. Atkins* (2001) 25 Cal.4th 76, 85-86, "the term 'malicious,' as used in section 7, subdivision (4), does not transform an offense into a specific intent crime." " 'Rather, the requirement of malice functions to ensure that the proscribed conduct was "a deliberate and intentional act, as distinguished from an accidental or unintentional" one.' " (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1170.)

Section 7, subdivision (4)'s expansive definition of malice supports our view that a good faith and reasonable belief under section 278.7, subdivision (a), though related to the issue of malice, does not establish an absence of malice and cannot, in isolation, serve as a complete defense to the crime of child custody deprivation under section 278.5. It follows that a person claiming a defense under section 278.7, subdivisions (a) or (b) must still comply with the reporting and custody proceeding requirements set forth in subdivisions (c) and (d). We therefore conclude that *Mehaisin* remains good law. As we shall discuss, our conclusion requires us to reject two of defendant's claims of error. (See Sections II.A.6 and II.C, *infra*.)

### 4. CALCRIM No. 250

Defendant contends the trial court erred in instructing the jury with CALCRIM No. 250 (Union of Act and Intent: General Intent), rather than CALCRIM No. 251 (Union of Act and Intent: Specific Intent or Mental State). We conclude that the trial court erred in instructing the jury with CALCRIM No. 250, but the error was harmless.

A trial court has a sua sponte duty to instruct on all of the elements of a charged offense (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311; *People v. Magee* (2003) 107 Cal.App.4th 188, 193), including the mental state required to commit the offense and the union of that mental state and the defendant's act. (*People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1185; see *People v. Garcia* (2001) 25 Cal.4th 744, 754.)

The trial court originally opined that child custody deprivation is a specific intent crime, which would require an instruction on the union of act and specific intent under CALCRIM No. 251. Later, the trial court concluded that the prosecution was proceeding

34

under a general intent theory, which would require an instruction on the union of act and general intent under CALCRIM No. 250. We need not decide whether child custody deprivation is a general or specific intent crime (see *People v. Atkins, supra,* 25 Cal.4th at pp. 85-86) because, regardless of classification, the trial court should have instructed the jury with CALCRIM No. 251.

As defendant observes, the Judicial Council's Bench Notes to CALCRIM No. 250 state, "this instruction **must not** be used if the crime requires a specific mental state, such as knowledge or malice, even if the crime is classified as a general intent offense. In such cases, the court must give CALCRIM No. 251, *Union of Act and Intent: Specific Intent or Mental State.*" Similarly, the Judicial Council's Bench Notes to CALCRIM No. 251 state, "This instruction **must** be given if the crime requires a specific mental state, such as knowledge or malice, even if the crime is classified as a general intent offense."

Here, defendant was charged with child custody deprivation under section 278.5, which makes it a crime to *maliciously* deprive a lawful custodian of a right to custody, or a person of a right to visitation. (§ 278.5, subd. (a).) By its terms, section 278.5 requires "a specific mental state," namely, malice. Thus, the use of CALCRIM No. 250 was inappropriate. The trial court should have instructed the jury with CALCRIM No. 251.

Where an instruction is erroneous, we must determine whether the error was prejudicial. There are two standards for assessing prejudice: the harmless-beyond-a-reasonable-doubt test (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)), which applies to errors violative of the United States Constitution, or the reasonable-probability test (*People v. Watson, supra,* 46 Cal.2d at pp. 836-837), which applies to errors under California law. Where the error is the omission of "an element of [the] offense," such as the requisite mental state, it "is subject to harmless error analysis under *Chapman*." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) We conclude the error was harmless, even under *Chapman*.

Here, the jury was improperly instructed with CALCRIM No. 250 that, "A person acts with wrongful intent when he or she intentionally does a prohibited act . . . ; however, it is not required that he or she intend to break the law." The jury should have been instructed that, "For you to find a person guilty of the crime [of taking, enticing away, keeping, withholding or concealing a child, a violation of [section] 278.5, as charged in Count 1,] that person must not only intentionally commit the prohibited act . . . , but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime." (CALCRIM No. 251.) The jury would have then referred to the modified version of CALCRIM No. 1251, which states, "Someone acts *maliciously* when he or she intentionally does a wrongful act." [8]

We perceive no practical significance, in the particular circumstances of this case, between the incorrect formulation given by the trial court and the correct formulation described above. The jury was properly instructed that the prosecution was required to prove that defendant intentionally committed a *prohibited act*; the correct instruction would have additionally explained that the prosecution was required to prove that defendant intentionally committed a *wrongful act*. CALCRIM No. 250, though technically inappropriate, did nothing to remove the mental state element from the jury's consideration or relieve the prosecution of its burden of proof.

In any event, the error was harmless. Even assuming, without deciding, that section 278.5 requires a specific intent to deprive a lawful custodian of the right to custody or visitation, there was overwhelming evidence that defendant acted with such an intent during the period from mid-November 2009 through July 2014. Evidence that defendant acted with a specific intent to deprive J.C. of custody or visitation included: (1) J.C.'s numerous emails from November 2009 through July 2014 expressing his wish

---

[8] We note that the jury was properly instructed with CALCRIM No. 251 in the first trial.

36

for a relationship with his daughter, (2) Jenny's November 9, 2009, email urging defendant to participate in the family court proceedings, and warning that "you could be charged with kidnapping because [J.C.] has legal rights," (3) Smith's emails from December 2009 through February 2010, including her email enclosing copies of the petition and related orders in the family court proceedings, and (4) defendant's testimony acknowledging that she knew J.C. wanted some kind of relationship with V.

Although defendant testified that she stopped reading J.C.'s emails after he threatened to send a "very scary bounty hunter" to find her, she acknowledged knowing that J.C. loved V. and wanted to maintain a relationship with her. Similarly, though defendant denied knowing about the family court proceedings when she left for South Korea on November 8, 2009, she acknowledged having received Jenny's email, which made clear that J.C. wanted to remain in V.'s life, and had commenced family court proceedings to protect his right to do so. Defendant also responded to Smith's emails, raising an overwhelming inference that she read and understood them. Smith's emails, which identified her as a member of the Yolo County District Attorney's Office, Child Abduction Unit, made clear that family court proceedings were underway, and defendant had an obligation to participate. This evidence was more than enough to satisfy the prosecution's burden of proving beyond a reasonable doubt that defendant maliciously deprived J.C. of custody or visitation, even assuming, arguendo, that the term "malicious" denotes a specific intent crime. (But see *People v. Atkins, supra,* 25 Cal.4th at pp. 85-86.) We therefore conclude that the failure to instruct the jury with CALCRIM No. 251 was harmless beyond a reasonable doubt (*Chapman, supra,* 386 U.S. at p. 24), and reject defendant's first claim of instructional error.

    *5.    CALCRIM No. 1252*

Next, defendant argues the trial court erred in instructing the jury with CALCRIM No. 1252 over her objection. She contends CALCRIM No. 1252 was inconsistent with the defense theory of the case, and suggests the instruction undermined her trial strategy

and confused the jury.  The People respond that the trial court had an obligation to educate the jury on applicable principles of law.  The People argue that defendant introduced evidence of domestic violence, thereby putting CALCRIM No. 1252 at issue.  According to the People, "the evidence of domestic violence had no independent relevance; accordingly, the trial court was justified in instructing on the defense, which was necessary for the jury's understanding of the case."

The parties frame their disagreement in terms of whether the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 1252.  We view the question presented somewhat differently.  Here, we are not called upon to decide whether a trial court has a sua sponte duty to instruct the jury with a defense that was not requested and may have been overlooked; rather, we must decide whether the trial court should have instructed the jury with an affirmative defense over defendant's express objection.

The parties have not drawn our attention to any published California case addressing this issue, and our own research has uncovered none.  In the absence of any California authority directly on point, we accept the parties' analogy to sua sponte instructional duties.  Upon consideration of the case law delineating such duties, we conclude (1) the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 1252, (2) a trial court should not instruct the jury with an affirmative defense that is inconsistent with the defense theory of the case over the defendant's objection, and (3) CALCRIM No. 1252 was inconsistent with defendant's theory of the case.  We therefore conclude the trial court erred in instructing the jury with CALCRIM No. 1252.  As we shall discuss, we further conclude that the error was harmless.  (See Section II.A.5.d, *infra*.)

        *a.*      *The Trial Court Had No Sua Sponte Duty to Instruct the Jury With CALCRIM No. 1252*

Our Supreme Court reviewed the law governing sua sponte instructional duties in *People v. Anderson* (2011) 51 Cal.4th 989, 996-997 (*Anderson*).  The court explained that

38

while trial courts have a duty to give sua sponte instructions regarding defenses invoked by the defendant, the presentation of evidence to negate an element of the charged offense is not considered presenting a defense:

"That the law recognizes a defense of accident does not, however, establish that trial courts have a duty to instruct on accident sua sponte. 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' [Citation.] But ' "*when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties.* While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request." ' " (*Anderson, supra,* 51 Cal.4th at pp. 996-997, first italics added.)

Here, defendant offered evidence of domestic violence to negate the prosecution's proof of malice. If the question presented were whether the trial court had a duty to instruct the jury with CALCRIM No. 1252 *on its own initiative* (sua sponte), *Anderson* would require us to answer the question in the negative. (*Anderson, supra,* 51 Cal.4th at pp. 996-997; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 874-875 [trial court did not have a sua sponte duty to instruct jury on defense of claim of right in robbery prosecution, as the asserted claim of right served only to negate the intent to steal element of the robbery charges].) As indicated above, however, the question before us is slightly different. Here, we must decide whether the trial court erred in giving the instruction

over the defendant's objection.  To answer this question, we must examine the principles underlying a trial court's sua sponte instructional duties.

        b.        *The Trial Court Should Not Instruct the Jury With An Inconsistent Affirmative Defense Over Defense Objection*

Any discussion of sua sponte instructional duties must begin with *People v. Sedeno* (1974) 10 Cal.3d 703, 715 (*Sedeno*), overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 178 (*Breverman*).)  In *Sedeno*, the defendant was charged with murder for shooting a police officer with the officer's own gun.  (*Sedeno, supra,* at pp. 709-710.)  At trial, the defendant argued he was not guilty of murder because mental illness rendered him incapable of acting with malice.  (*Id.* at pp. 713-714.)  He also argued, based on his own testimony, that the officer was shot when the gun accidentally discharged during a struggle with the officer, and he lacked the intent to kill.  (*Id.* at p. 714.)  The jury convicted the defendant of first degree murder.  (*Id.* at p. 709.)  On appeal, the defendant argued that the trial court erred in not instructing the jury on the lesser included offenses of voluntary and involuntary manslaughter and on the defenses of unconsciousness and self-defense.  (*Id.* at pp. 717, 718.)  The court found no error in the trial court's failure to instruct on voluntary manslaughter, unconsciousness and self-defense, but concluded that the trial court should have instructed the jury on involuntary manslaughter.  (*Id.* at pp. 719-720.)

The court began by distinguishing between the relatively broad duty to instruct on lesser included offenses, and the more limited duty to instruct on defenses.  A duty to instruct on a lesser included offense arises, "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged."  (*Sedeno, supra,* 10 Cal.3d at p. 715.)  Significantly, "The obligation to instruct on lesser included offenses exists *even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given*."  (*Id.* at p. 716, italics added.)  The

40

court explained: "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Ibid.*)

By contrast, the court continued, a trial court's duty to instruct on particular defenses is more limited, arising "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with defendant's theory of the case." (*Sedeno, supra,* 10 Cal.3d at p. 716, italics added.) The court explained: "[T]his limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, *but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon.* [¶] 'Appellate insistence upon *sua sponte* instructions which are inconsistent with defense trial theory or are not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions.' " (*Id.* at pp. 716-717, first italics added.)

The *Sedeno* court elaborated on the trial court's instructional duties in a footnote, stating: "We deem it appropriate to emphasize that the duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests. If it appears to the court, however, that there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, *the court should ascertain from the defendant whether he wishes instructions on the alternative theory.* Such inquiry will afford assurance that the theory has not been inadvertently overlooked by counsel." (*Sedeno*, *supra*, 10 Cal.3d at p. 717, fn. 7, italics added.) As we shall discuss, *Sedeno*'s directive that the trial court "ascertain from the defendant whether he wishes instructions" strongly suggests that the defendant may refuse an instruction on an alternative defense theory, if she so chooses.

41

Our Supreme Court revisited *Sedeno* in *People v. Barton* (1995) 12 Cal.4th 186 (*Barton*), another case involving a homicide in which the defendant claimed to have fired a gun accidentally. (*Id.* at pp. 194-195, 198-199.) There, defense counsel specifically requested that no instructions be given on the lesser included offense of heat of passion manslaughter. (*Id.* at p. 190.) The trial court gave the instruction over defense counsel's objection. (*Ibid.*) The *Barton* court affirmed, declining the defendant's invitation to overrule *Sedeno*. (*Id.* at p. 190.) The court explained:

"Defendant's proposed rule permitting the defense, upon request, to bar the trial court from instructing the jury on lesser included offenses supported by the evidence would . . . not only impair the jury's search for truth, but would also be unfair to the prosecution. Sometimes the prosecution's evidence that a defendant has committed the crime charged may be relatively weak, whereas the evidence of a lesser included offense may be much stronger. In that case, a prosecutor need not, and generally does not, separately charge a defendant with the lesser included offense. [Citations.] If instructions on a lesser included offense could be barred at the defendant's request, the prosecutor would be denied the opportunity to argue to the jury that the defendant, even if not guilty of the crime charged, is at least guilty of the lesser included offense.

"When, however, the question is whether the trial court must, on its own initiative, instruct the jury on *defenses* not asserted by the defendant, different considerations arise. Failure to so instruct will not deprive the jury of the opportunity to consider the full range of criminal offenses established by the evidence. Nor is the prosecution denied the opportunity to seek conviction on all offenses included within the crime charged. *Moreover, to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant.*" (*Barton*, *supra*, 12 Cal.4th at pp. 196-197, second italics added.)

42

Thus, the *Barton* court concluded that public policy considerations justify the imposition of an instruction on a lesser included offense over the defendant's objection. (*Barton*, *supra*, 12 Cal.4th at pp. 196-197.) Implicit in the *Barton* court's conclusion, with its emphasis on the fundamental distinction between lesser included offenses and defenses, is the further conclusion that a trial court should *not* instruct the jury on a defense over the defendant's objection.

The Supreme Court revisited *Sedeno* once again in *Breverman*. There, a group of young men vandalized the defendant's car and attempted to provoke a fight with him in front of his home. (*Breverman, supra,* 19 Cal.4th at p. 151.) The defendant shot into the crowd, first from his front door and then again from outside, killing one of the young men. (*Id.* at pp.150-151.) The defendant told police that he had not aimed at any of the young men and had not intended to hit any of them. (*Ibid.*) The question presented was whether the trial court should have instructed the jury on the lesser included offense of heat of passion manslaughter, notwithstanding the defendant's statement that he had not intended to shoot anyone. (*Id.* at p. 153.) The court answered the question in the affirmative, taking the opportunity to reconsider *Sedeno*'s standard of reversal. (*Id.* at p. 165.)

Though *Breverman* overruled the *Sedeno* standard of reversal, the court reaffirmed *Sedeno*'s analysis of sua sponte instructional duties, stating:

"In *Sedeno, supra,* 10 Cal.3d 703, we noted that the sua sponte duty to instruct on all material issues presented by the evidence extends to *defenses* as well as to lesser included *offenses* (*id.* at p. 716), but we drew a sharp distinction between the two situations. In the case of *defenses*, we concluded, a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' (*Ibid.,* italics added.) Thus, when the trial court believes 'there is substantial evidence that would support a *defense* inconsistent with that

43

advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.' (*Id.*, at p. 717, fn. 7, italics added.)" (*Breverman*, *supra*, 19 Cal.4th at p. 157.)

Thus, *Breverman* confirms that a trial court confronted with " 'substantial evidence that would support a defense inconsistent with that advanced by a defendant' " should " 'ascertain from the defendant whether he wishes instructions on the alternative theory.' " (*Breverman*, *supra*, 19 Cal.4th at p. 157.)

As indicated above, *Breverman* and *Sedeno* dealt specifically with the question of when a trial court has a *sua sponte* instructional duty, rather than the precise question before us. *Barton* dealt with the closely related, but fundamentally distinct, question whether a trial court should instruct the jury with a lesser included offense over the defendant's objection. Thus, none of these authorities directly answer the question before us. Nevertheless, *Breverman*, *Barton* and *Sedeno* strongly suggest that a trial court should not instruct the jury with an affirmative defense over the defendant's objection. *Sedeno* not only recognizes the "potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon," (*Sedeno*, *supra*, 10 Cal.3d at p. 716) it also directs the trial court to "ascertain from the defendant whether he wishes instructions on the alternative theory" (*Id.* at pp. 717, fn. 7). Implicit in this directive, which *Breverman* and *Barton* repeat, is "the corollary that the trial court should give the instruction on the alternate defense if the defendant so requests upon being asked by the court." (*People v. Elize* (1999) 71 Cal.App.4th 605, 615 [trial court prejudicially erred in refusing the defendant's request to instruct the jury on self-defense, though the defendant testified he fired gun accidentally, since the jury could have disbelieved the defendant's testimony].) It would likewise seem to follow that the trial court should *not* instruct the jury with an alternative defense if, upon inquiry, the defendant indicates he does not want the instruction. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49 ["If the defense is supported by the evidence but is inconsistent with the defendant's theory of the case, the

44

trial court should instruct on the defense only if the defendant wishes the court to do so"].)

Based on the foregoing, we conclude that a trial court should not instruct the jury on an inconsistent affirmative defense over the defendant's objection. Having so concluded, we next consider whether CALCRIM No. 1252 was inconsistent with defendant's theory of the case. We conclude it was.

> c.    *CALCRIM No. 1252 Was Inconsistent With the Defense Theory of the Case*

Defendant argues CALCRIM No. 1252 was inconsistent with the defense theory of the case, which sought to hold the prosecution to its burden of proof, rather than establish an affirmative defense under section 278.7. The People respond that defendant put the defense at issue by offering evidence of domestic violence. Defendant has the better argument.

During the trial, defendant's sole "defense" was that the prosecution failed to prove its case. Defendant made no attempt to show that she complied with section 278.7's reporting and custody proceeding requirements. Defense counsel emphatically denied that defendant was relying on section 278.7, as the trial court necessarily acknowledged. Even the prosecution acknowledged that "the defense [was] not claiming a statutory defense pursuant to [section] 278.7." Instead, as the prosecutor also recognized, the defense theory of the case was that the prosecution failed to prove malice beyond a reasonable doubt.

Section 278.7 was inconsistent with the defense theory of the case, which sought to hold the prosecution to its burden of proving the elements of child custody deprivation, because, as an affirmative defense, section 278.7 required the jury to presume that the prima facie elements of the crime were true. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1601 ["an affirmative defense is one which presumes the prima facie elements of the crime are true, but exculpates the defendant because of excuse or justification"].)

45

Though section 278.7 offers a defense to the crime of child custody deprivation, the statute presupposes that the acts constituting the crime have indeed been committed. (*People v. Noble* (2002) 100 Cal.App.4th 184, 189 ["An affirmative defense is one which does not negate an essential element of a cause of action or charged crime, but instead presents new matter to excuse or justify conduct that would otherwise lead to liability"].)

By instructing the jury with CALCRIM No. 1252, the trial court placed defendant in the potentially contradictory position of having to argue, on the one hand, that the prosecution failed to prove she committed the crime of child custody deprivation and, on the other hand, that if she committed the acts constituting the crime she was justified in so doing. Put another way, the trial court's instruction required defendant to acknowledge, if only inferentially, the existence of facts which she otherwise denied. (See CALCRIM No. 1252 [instructing the jury that the defendant did not maliciously deprive a lawful custodian of a right to custody or visitation if the defendant "[h]ad a good faith and reasonable belief *when abducting the child* that the child would suffer immediate bodily injury or emotional harm if left with the other person" (italics added)].) We therefore conclude that the instruction was inconsistent with the defense theory of the case.

The People do not address whether CALCRIM No. 1252 was inconsistent with the defense theory of the case. Instead, the People argue that CALCRIM No. 1252 was appropriately given because "the defense introduced evidence of domestic violence— through [defendant's] own testimony and that of an expert—ostensibly to demonstrate [defendant's] 'state of mind' and 'the reasons for her conduct.' " According to the People, such evidence "had no independent relevance," other than to support a good faith defense under section 278.7, subdivision (a). We perceive two fundamental problems with the People's argument.

First, the People's argument ignores the fact that *the prosecution* offered evidence of domestic violence during its case in chief. Though defendant testified about a violent

46

altercation with J.C. in October 2009, the jury had already heard about the same incident through the prosecution's direct examination of J.C. Similarly, though Kim testified that Korean women are frequently reluctant to leave their abusive partners or report abuse to authorities, Kim's testimony was offered in response to the prosecution's expert, Enriquez, who specifically testified that section 278.7 offers an affirmative defense to child custody deprivation for victims of domestic violence. Thus, contrary to the People's suggestion, defendant was not the only party to offer evidence of domestic violence. Rather, a fair reading of the record reveals that domestic violence served as a narrative thread throughout the entire trial, including the prosecution's case in chief. We therefore reject the People's suggestion that defendant opened the door to CALCRIM No. 1252 by offering evidence of domestic violence.

Second, the People's argument ignores the circumstances under which the evidence was offered. As previously discussed, the parties originally planned to use the unmodified version of CALCRIM No. 1251, which defines the element of malice as follows: "Someone acts *maliciously* when he or she intentionally does a wrongful act *or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else*." (Second italics added.) Though evidence of domestic violence may not have been relevant to the question of whether defendant *intentionally* deprived J.C. of a right to custody or visitation, such evidence would have a tendency to negate the theory that defendant acted with "the unlawful intent to disturb, defraud, annoy, or injure someone else." (CALCRIM No. 1251.) Thus, evidence of domestic violence was relevant to negate the element of malice, as originally defined.

During the course of the trial, the prosecution elected to proceed under a modified version of CALCRIM No. 1251, which defined the element of malice as follows: "Someone acts *maliciously* when he or she intentionally does a wrongful act." However, the prosecutor does not appear to have made this election until *after* defense counsel completed his direct examination of defendant, the last witness for the defense. So far as

47

the record reveals, the prosecution was still pursuing *both* theories of malice—malice in fact and malice in law—at the time the domestic violence evidence was adduced. As we have already suggested, such evidence would have a tendency to negate the theory of malice in fact, which was originally part of the prosecution's theory of the case.

The People argue that CALCRIM No. 1252 was necessary to put the domestic violence evidence in context. We recognize that the evidence of domestic violence may have been hard for the jury to evaluate in the absence of an explanation. We also recognize that the trial court had a duty to instruct the jury on general principles applicable to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 117.) Where we part company with the People, however, is in their view that the *only* way to educate the jury on the legal significance of the domestic violence evidence was by instructing the jury with CALCRIM No. 1252 over defendant's objection.

Contrary to the People's apparent belief, the trial court was not limited to the stark choice of instructing the jury with CALCRIM No. 1252 against defendant's wishes or not instructing them at all. The trial court could have offered guidance on the legal significance of the domestic violence evidence without imposing an inconsistent defense on an unwilling defendant. The trial court should not have instructed the jury with an affirmative defense that defendant did not want and could not satisfy.

Finally, the People argue that CALCRIM No. 1252 was appropriately given as a matter of fairness to the prosecution and fealty to the underlying purposes of the child deprivation laws. (See, e.g., *People v. Lortz* (1982) 137 Cal.App.3d 363, 368 [explaining that section 278.5 was enacted "to encourage parents who are unhappy with custody or visitation provisions under existing conditions to return to the civil court to seek judicial clarification or modification of the order, and to discourage them from taking the law into their own hands by concealing the child in a place unknown to the other parent"].) According to the People, "To allow the defense to introduce evidence of domestic

48

violence and then deny the prosecution the opportunity to explain the relevance of that evidence would be patently unfair and would frustrate the aim of the statute." The People's argument is not well taken.

As noted, domestic violence was a recurring theme in *both* parties' presentations. Nothing in the record suggests that defendant offered evidence of domestic violence in an attempt to raise an unasserted defense under section 278.7. Although we can imagine a scenario in which a defendant introduces evidence of domestic violence as part of a jury nullification strategy, we have no reason to believe that occurred here. To the contrary, the record demonstrates that the *prosecution* raised the issue of domestic violence, and then sought to use section 278.7 as a yardstick by which to measure defendant's intent. In so doing, the prosecution transformed section 278.7 from a shield into a sword, effectively turning the statute on its head. We further note that one jurisdiction has concluded that the imposition of an affirmative defense over the defendant's objection violates the Sixth Amendment by interfering with the defendant's right to present a defense of her own choosing. (*State v. Coristine* (Wash. 2013) 177 Wn.2d 370, 378 [300 P.3d 400, 404].) We need not consider this constitutional issue, given our conclusion that the instruction was improper under existing decisional law. Nevertheless, we caution prosecutors against interfering with defense counsel's strategic decisions, which may well include the strategic decision to forego an affirmative defense.

### d. The Error Was Harmless

Having concluded that the trial court erred in instructing the jury with CALCRIM No. 1252, we must now consider whether the error was prejudicial. Defendant contends the instructional error should be reviewed under *Chapman*, which requires reversal unless the error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 23.) The People do not address the issue of prejudice. We assume without deciding that *Chapman* applies.

49

Under *Chapman*, the beneficiary of a federal constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. (*Chapman, supra,* 386 U.S. at p. 24.)  An error that did not contribute to the verdict is one that is " ' "unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)  Thus, reversal is required unless the record shows beyond a reasonable doubt that defendant was not prejudiced by the erroneous instruction under CALCRIM No. 1252.  Based on our review of the entire record, we conclude the erroneous instruction was unimportant in relation to everything else the jury considered on the issue of malice.

" 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)  Here, the jury was instructed pursuant to CALCRIM No. 200 that not all instructions were necessarily applicable, and to disregard any instructions that applied to facts determined not to exist.  Jurors are presumed to follow the trial court's instructions. (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.)  The jury was also instructed that the prosecution had the burden of proving each element of the charged offense beyond a reasonable doubt.  When the jury raised questions about CALCRIM No. 1252, they were again instructed that the prosecution bore the burden of proof beyond a reasonable doubt.  Viewed as a whole, the trial court's instructions and supplemental instructions clearly conveyed that the prosecution bore the burden of proof. (*People v. Holt* (1997) 15 Cal.4th 619, 677 ["[I]nstructions are not considered in isolation.  Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury"].)

Defense counsel also reminded the jury of the prosecution's burden of proof. (*People v. Chavez* (2004) 118 Cal.App.4th 379, 388 ["In addition, closing arguments to the jury are relevant in evaluating prejudice"].)  During closing arguments, defense

counsel acknowledged that the elements of CALCRIM No. 1252 had not been met, but emphasized that, "If you go on and read the rest of CALCRIM [No.] 1252, you'll see where it says that the People, and I'll insert the word 'still,' have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a lawful custodian of a right to custody or a right to visitation.  If the People have not met this burden, you must not find—you must find the defendant not guilty."  Defense counsel's argument, in combination with the instructions and supplemental instructions, made clear that the prosecution bore the burden of proof, regardless of CALCRIM No. 1252.

Furthermore, as we have already explained, the evidence that defendant maliciously deprived J.C. of custody or visitation during the period from mid-November 2009 through July 2014 was overwhelming, and largely uncontested.

Based on our review of the entire record, including the instructions as a whole, the supplemental instructions, the arguments of counsel, the jury's notes and the evidence, we conclude the trial court's error in giving CALCRIM No. 1252 was harmless beyond a reasonable doubt.  We emphasize that our conclusion is limited to the particular circumstances of this case, and should not be construed to countenance the trial court's error or the prosecutor's decision to request the instruction over the defendant's objection.  Although we are convinced the jury was not misled by the erroneous instruction in the present case, we can easily imagine another scenario in which the imposition of an affirmative defense over the defendant's objection would require reversal.  Nevertheless, on the record before us, we are convinced beyond a reasonable doubt that defendant was not prejudiced by the trial court's error.  We therefore reject defendant's second claim of instructional error.

6.      *The Supplemental Instructions*

Next, defendant argues that the trial court failed to properly respond to the jury's questions regarding the relationship between section 278.5 and section 278.7.  Specifically, defendant faults the trial court for failing to instruct the jury that a person

with a good faith and reasonable belief that her child, if left with the other person, would suffer immediate bodily injury or emotional harm has a complete defense to the crime of child custody deprivation, whether or not she complies with section 278.7's reporting and custody proceeding requirements.

Defendant's challenge to the trial court's supplemental instructions is premised on her theory that *Neidinger* overruled *Mehaisin*. Having rejected defendant's underlying thesis (see Section II.A.3, *ante*), we likewise reject her claim that the trial court erred in responding to the jury's questions regarding the relationship between section 278.5 and section 278.7.

### 7. *The Proposed Pinpoint Instruction*

Next, defendant argues the trial court prejudicially erred in denying her request for a pinpoint instruction that would precede CALCRIM No. 1252 and state, "This next instruction is just one of many possible ways to show that the defendant did not act maliciously. It is not the only exclusive way to show that the defendant did not have the required mental state." The trial court refused to give the requested instruction on the grounds that it was duplicative of CALCRIM No. 1252, which provides, in pertinent part, "The People have the burden of proving beyond a reasonable doubt that the defendant maliciously deprived a (lawful custodian of a right to custody/ [or] person of a right to visitation). If the People have not met this burden, you must find the defendant not guilty." We find no error.

Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense . . . if the theory proffered by the defendant is supported by substantial evidence" (*People v. Randolph* (1993) 20 Cal.App.4th 1836, 1841), the instruction is a correct statement of law (*People v. Bivert* (2011) 52 Cal.4th 96, 120), and the proposed

instruction does not simply highlight specific evidence the defendant wishes the jury to consider (*People v. Wright* (1988) 45 Cal.3d 1126, 1137).

The trial court may properly refuse an instruction highlighting a defense theory if it is "duplicative or potentially confusing." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1276.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; see e.g., *People v. Gonzales, supra,* at p. 1276 [trial court did not err in refusing to instruct jury that " 'a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder' " where topic was covered by standard aiding and abetting and child endangerment instruction and "giving two different instructions on the same topics would risk confusing the jury"].) Put another way, "[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) The failure to give an instruction on even an essential issue "may be cured if the essential material is covered by other correct instructions properly given." (*Ibid.*)

The proposed instruction was intended to deemphasize CALCRIM No. 1252, an instruction defendant did not want and could not meet. Although we understand defendant's desire to draw the jury's attention away from CALCRIM No. 1252, the proposed pinpoint instruction was confusing and duplicative. As previously discussed, the defense theory of the case was that the prosecution failed to prove malice beyond a reasonable doubt. That theory was adequately conveyed in the trial court's other instructions, the supplemental instructions, and arguments of counsel. (See Section II.A.5.4, *ante.*) Defendant did not raise any other defenses, and a pinpoint instruction directing the jury's attention to other unspecified ways of disproving malice would have

been confusing, duplicative, and unsupported by substantial evidence. The court did not err in rejecting the proposed pinpoint instruction.

### 8. *Cumulative Instructional Error*

Defendant contends she was prejudiced by the cumulative effect of the trial court's asserted errors in giving CALCRIM No. 1252 and refusing to give the proposed pinpoint instruction.[9] We have already concluded that the error in giving CALCRIM No. 1252 was harmless beyond a reasonable doubt. (See Section II.A.5.d, *ante.*) We have also concluded that the trial court did not err in refusing to give the proposed pinpoint instruction. (See Section II.A.7, *ante.*) It follows that the cumulative effect of giving CALCRIM No. 1252 and refusing to give the pinpoint instruction was also harmless. Though defendant's discussion of prejudice makes no mention of the trial court's error in giving CALCRIM No. 250, we have also concluded that error was harmless, and could have made no practical difference to the jury's deliberations. (See Section II.A.4, *ante.*) We therefore conclude that the asserted errors are harmless beyond a reasonable doubt, even when viewed cumulatively.

We reject defendant's attempt to demonstrate prejudice by pointing to the hung jury in the first trial. Although a previous hung jury might demonstrate prejudice in some circumstances (see *In re Richards* (2016) 63 Cal.4th 291, 320 (conc. opn. of Liu, J.) [collecting cases recognizing the relevance of prior hung juries to the determination of prejudice]), it does not help defendant here. Here, both juries were instructed with

---

[9] Defendant's opening brief includes a section header stating, "The Instructional Errors Were Patently Prejudicial," suggesting that she believes she was prejudiced by the cumulative effects of all of the asserted errors. However, the ensuing discussion focuses solely on the cumulative effects of CALCRIM No. 1252 and the pinpoint instruction. As discussed in the text, we conclude that none of the asserted errors were prejudicial, either individually or cumulatively.

CALCRIM No. 1252.[10]  Both juries posed questions regarding the relationship between CALCRIM No. 1251 and CALCRIM No. 1252, some of which demonstrated initial confusion over the applicable burden of proof.  However, both juries were properly reminded that the prosecution bore the burden of proving the elements of the offense beyond a reasonable doubt.[11]  Although the first jury was properly instructed with CALCRIM No. 250, and the second jury improperly instructed with CALCRIM No. 251, we cannot conclude that the differences between the two pattern instructions, in the particular circumstances of this case, resulted in any prejudice to defendant.  We do not know why defendant's first jury was unable to reach a verdict, but nothing in the record suggests that the second jury received qualitatively different instructions than the first.  To the contrary, the instructions were largely consistent.  We therefore conclude, on the record before us, that the jury's inability to reach a verdict in the first trial does not establish prejudice in the second.

B.    *Expert Witness Testimony*

Defendant contends the trial court erred in allowing Enriquez to testify about the "good cause" defense under section 278.7, because her testimony purported to inform the jury on a question of law, thereby infringing on the trial court's duty to instruct the jury

---

[10] The first jury was apparently instructed with CALCRIM No. 1252 without defense objection.

[11] Defendant observes that defense counsel told the first jury, in response to one of its questions, that "There may be countless defenses in addition to [CALCRIM No.] 1252.  It is not the only defense."  As previously discussed, defendant was not entitled to a pinpoint instruction emphasizing the existence of other unasserted defenses (see Section II.A.7, *ante*), and could not assert a "good cause" defense under section 278.7 without complying with subdivisions (c) and (d).  (See Section II.A.3, *ante.*)  We note, however, that defense counsel similarly argued during closing argument in the second trial that CALCRIM No. 1252 was designed to "get you into an equation where you think this is the only defense.  That's not true."  Thus, both juries were also told that CALCRIM No. 1252 was not "the only defense."

on the law.  We review a trial court's decision to admit expert testimony for abuse of discretion.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; *Kastner v. Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52, 57 ["in this field much must be left to the common sense and discretion of the trial court"].)  We perceive no abuse of discretion here.

"As a general rule, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .'  (Evid. Code, § 801, subd. (a).)  Additionally, in California:  'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'  (Evid. Code, § 805.)  However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes.  [Citation.]  There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law."  (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178; see *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841 [" 'The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion' "].)

Enriquez testified that section 278.7 offers a defense to victims of domestic violence who comply with the statute's reporting and custody proceeding requirements.  The trial court could reasonably conclude that the existence of such a law was sufficiently beyond common knowledge that the opinion of an expert would assist the trier of fact.  (Evid. Code, § 801, subd. (a); cf. *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513 [former head of Department of Labor Standards Enforcement could offer expert opinion explaining criteria for executive exemption from payment of overtime compensation and benefits); see also *Marx & Co. v. Diners' Club, Inc.* (2d Cir. 1977) 550 F.2d 505, 508-509 [attorney could "explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement

through the [Securities and Exchange Commission]," but could not offer legal opinions as to the meaning of contract terms in dispute], cited with approval in *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 63-64 [attorney could properly opine regarding contract issues implicating customs and practices of the entertainment industry].)

Here, though Enriquez offered an overview of section 278.7, she expressed no opinion as to whether or not section 278.7 applied to the particular facts of the case. Her testimony did not encompass any legal conclusion or opinion on any ultimate issue, and cannot be said to have usurped the jury's fact-finding role. Furthermore, we cannot say that Enriquez's testimony infringed the trial court's duty to instruct the jury on the law, particularly inasmuch as the trial court could not have known, at the time of the challenged ruling, that CALCRIM No. 1252 would even be requested. We therefore conclude that the trial court did not abuse its discretion in allowing the testimony.[12]

## C.     *Prosecutorial Misconduct*

Defendant argues the prosecutor committed prosecutorial misconduct by misstating the law in a motion urging the trial court to instruct the jury with CALCRIM No. 1252, and misstating the law during closing argument. Specifically, defendant contends the prosecution (1) incorrectly informed the trial court that *Mehaisin* remains good law, (2) incorrectly informed the jury that defendant could not claim a "good cause" defense under section 278.7 because she did not comply with subdivisions (c) and (d),

---

[12]  Defendant also argues that the trial court improperly allowed the prosecutor to ask Enriquez whether, "If there was no [family law] case in Sacramento at all, if [J.C.] had never filed this—[the petition for visitation], the declaration, and asked to go to court, if none of that had even happened, and [defendant] had left for five years and never given [J.C.] any contact with the child, would that still be a possible child abduction?" Enriquez responded "[y]es," and defense counsel lodged an objection. Contrary to defendant's suggestion, the objection was sustained. Consequently, we also reject any claim of error arising from the challenged hypothetical question.

and (3) improperly urged the trial court to instruct the jury with CALCRIM No. 1252 to effectuate the legislative purposes underlying section 278.7.

Defendant's claim is forfeited. As our Supreme Court recently reiterated, " ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Covarrubias, supra,* 1 Cal.5th at p. 894.) Here, though defendant objected to the imposition of CALCRIM No. 1252, she did not object on the ground of prosecutorial misconduct and did not challenge the prosecution's understanding of section 278.7 until much later, when she filed her motion for a new trial. Raising an error for the first time in a motion for a new trial is not sufficient to preserve the issue for appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 794.) We therefore conclude the issue is forfeited on appeal.

*D.    Election or Unanimity Instruction*

Because the prosecution suggested several ways in which defendant violated section 278.5, defendant contends the trial court should have forced an election or instructed the jury on the requirement of unanimity. The People respond that no such election or instruction was required because section 278.5 contemplates a continuous course of criminal conduct. The People have the better argument.

A criminal defendant has a constitutional right to a unanimous jury verdict, meaning "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' [Citations.]" (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.) Accordingly, where no election has been made by the prosecution, the trial

court has a sua sponte duty to provide a unanimity instruction. (*People v. Dieguez, supra,* 89 Cal.App.4th at pp. 274-275.)

"Neither an election nor a unanimity instruction is required when the crime falls within the 'continuous conduct' exception." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882.) This exception arises in two contexts. (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) First, a unanimity instruction is not required when the criminal acts are so closely connected that they form part of the same transaction, and thus one offense. The second context occurs when the statute defines the offense to comprise a continuous course of conduct over a period of time. (*Ibid.*) "Cases applying the continuous conduct exception have generally relied on statutory interpretation to justify a conclusion that the nature of the crime is ongoing." (*Id.* at p. 225.)

Here, we have little difficulty concluding that section 278.5 contemplates a continuous course of conduct. Section 279.1 provides, "The offenses enumerated in Sections 278 and 278.5 are continuous in nature, and continue for as long as the minor child is concealed or detained." Section 279.1 makes crystal clear that section 278.5 contemplates a continuous course of conduct. We therefore conclude that the continuous course of conduct exception applies, and no election or unanimity instruction was required.

*E.*     *Removal of Juror No. 5*

Relying on *People v. Karapetyan* (2003) 106 Cal.App.4th 609 (*Karapetyan*), defendant argues the trial court improperly excused Juror No. 5, rather than correct the purportedly erroneous jury instructions. *Karapetyan* does not help defendant.

In *Karapetyan*, the trial court incorrectly instructed the jury on the provocative act doctrine. (*Karapetyan*, *supra*, 106 Cal.App.4th at p. 619.) Although an attempt to kill or assault someone with a firearm is a provocative act in and of itself (see *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 60; *People v. Gallegos* (1997) 54 Cal.App.4th 453, 461-462), the jury was instructed that the prosecution was required to show that a separate

provocative act had occurred, thereby increasing the prosecution's burden of proof. (*Karapetyan*, *supra*, at p. 619.) The jury struggled to identify a separate "provocative act," ultimately asking the trial court, " 'if shooting a gun in the air within city limits is a crime.' " (*Id.* at pp. 612-613.) The trial court responded, " 'Shooting a gun in the air, depending upon what you find to be all the attending circumstances may or may not constitute a crime.' " (*Id.* at p. 613.) After receiving the trial court's response, the jury sent another note complaining that Juror No. 12 was refusing to deliberate. (*Ibid.*) The trial court interviewed Juror No. 12 and found that "he was having problems determining what appellant's *additional* provocative act was. The other jurors, although they all believed there had been a separate provocative act, refused to discuss with Juror No. 12 what they believed was the additional provocative act." (*Id.* at p. 620.) The trial court excused Juror No. 12, and the Court of Appeal for the Second District, Division Seven, reversed. (*Id.* at pp. 617, 622.)

The court explained that "the jury was deadlocked on what should have been a non-issue in the case: the existence or nonexistence of a separate provocative act." (*Karapetyan*, *supra*, 106 Cal.App.4th at p. 620.) "Had the jury been correctly instructed," the court continued, "even Juror No. 12 was of the opinion appellant was guilty of murder in the second degree. Thus, with proper instructions, appellant probably would have been convicted and a verdict returned before the question on shooting a gun in the city limits was asked of the court. However, rather than correct the error in the instructions, the court chose to excuse Juror No. 12 because he was following the court's instructions." (*Ibid.*) Thus, *Karapetyan* involved a situation in which the holdout juror was excused for attempting to follow the trial court's erroneous instructions. This case is different.

Here, Juror No. 5 was excused because she refused to follow the law as instructed. Juror No. 5 represented to the other members of the jury that she could not morally make a decision in the case, adding that she would "rather go to jail" than continue to

60

deliberate. She told the trial court that the law was "unjust" and would "compromise who [she was] as a human being." She repeatedly represented that she was unable to follow the law as instructed, leading the trial court to conclude that she was unable to perform her duties as a juror. (*People v. Williams* (2001) 25 Cal.4th 441, 448 ["A juror who refuses to follow the court's instructions is 'unable to perform his [or her] duty' within the meaning of [section] 1089"].)

Unlike the holdout juror in *Karapetyan*, who was removed for attempting to follow the trial court's erroneous instructions, Juror No. 5 was removed because she refused to follow instructions that defendant believes to have been erroneous. Nothing in the record suggests that Juror No. 5 objected to the jury instructions on any of the grounds advanced herein, and we decline to so speculate. Regardless of her reasons, Juror No. 5's refusal to follow the law as instructed constituted grounds for discharge. (*People v. Alexander* (2010) 49 Cal.4th 846, 926 ["A deliberating juror's refusal to follow the law set forth in the instructions also constitutes a failure to perform the juror's duties, and is grounds for discharge"].) Nothing in *Karapetyan* supports defendant's contention that Juror No. 5 was improperly excused, and defendant suggests no other basis for so concluding. We therefore reject defendant's claim of error.

*F.    Substantial Evidence Supports the Conviction*

Finally, defendant challenges the sufficiency of the prosecution's evidence of malice. Defendant's argument proceeds from the premise that the trial court erred in failing to force an election as to the prosecution's theory of liability. To this end, defendant contends, "the only conduct for which [she] could have been prosecuted was taking her daughter with her to South Korea." Building on this premise, defendant argues that she could not have acted maliciously in leaving the United States, as her immigration status had expired and she was required to leave the country immediately. Defendant adds that she could not have left one-year old V. with J.C., as he was struggling with

61

PTSD, alcohol addiction, and anger control issues, all of which rendered him incapable of caring for a small child.

We have already rejected the premise of this argument: No election was required, and the jury was free to consider defendant's entire course of conduct. (See Section II.D, *ante.*) We have also explained that the evidence was overwhelming that defendant acted maliciously in keeping or withholding V. from J.C. from mid-November 2009 through July 2014. (See Section II.A.4, *ante.*) It follows that substantial evidence supports the jury's conclusion that defendant acted with malice. We therefore reject defendant's challenge to the sufficiency of the evidence.

### III. DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

RAYE, P. J.

/S/

_____

BUTZ, J.