Filed 8/16/22 P. v. Gonzalez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>CARMELO GONZALEZ,<br><br>     Defendant and Appellant. | F080665<br><br>(Super. Ct. No. BF178091A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. John D. Oglesby, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Timothy L. O'Hair, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Carmelo Gonzalez was arrested after a late-night confrontation with a stranded motorist led to a standoff with sheriff's deputies. Defendant was charged with making criminal threats (Pen. Code, § 422, subd. (a); count 1),[1] being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2), brandishing a firearm (§ 417, subd. (a)(2); count 3), and resisting a peace officer (§ 148, subd. (a)(1); count 4). Defendant was convicted by jury of firearm possession and resisting a peace officer, but he was acquitted of making criminal threats and brandishing a firearm. After defendant declined probation during the sentencing hearing, the trial court imposed the middle term of two years for firearm possession and a concurrent term of 365 days in jail for resisting arrest.

On appeal, defendant claims his conviction for resisting a peace officer is not supported by substantial evidence that he resisted any commands he understood, and his later refusal to open the door to deputies when commanded in Spanish is not sufficient to support the conviction. Alternatively, he claims that in light of the evidence of multiple acts and the prosecutor's failure to make an election, the trial court erred when it failed to instruct the jury on unanimity. Finally, he claims that the trial court erred when it denied his motion to suppress the in-field identification and any in-court identifications as tainted, and that the admission of the identification evidence violated his right to due process.

The People dispute any errors occurred, but they contend that if errors are assumed as to the unanimity instruction and the admission of the identification evidence, they were harmless.

We conclude that defendant's conviction for resisting a peace officer is supported by substantial evidence, a unanimity instruction was not required, and the trial court did

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

not err in denying defendant's motion to suppress the in-field identification. Therefore, we affirm the judgment.

## FACTUAL SUMMARY

In August 2019 between 10:00 and 11:00 p.m., Leslie T. was driving with her fiancé, John M., their infant son, her parents, and her uncle when their vehicle blew a tire after hitting a pothole. She pulled over next to a vacant lot that was across a four-lane street from an auto body repair shop.

John testified that he and Leslie's father tried to fix the tire, but did not have the tools they needed, so first a friend and then a relative came to help. During the time John was working on the tire, a stranger, later identified as defendant, appeared across the street. He was mumbling in English and in Spanish, and John tried to ignore him. After what John estimated to be 20 minutes, defendant crossed over to the center median dividing the street and told John to step away from the vehicle. John continued to ignore him, but defendant seemed to think John was trying to steal the vehicle and he also said something about John having his daughter in the vehicle.

John and his friend walked over to the center median to clear things up, but defendant reached for his side and took out a small, silver .22-caliber handgun, pointed it at the ground, and, in English, twice threatened to shoot if John came any closer. John did not think defendant was going to shoot him, but he was afraid and went back to his vehicle. Leslie called 911. Defendant stayed in the median for a while and then walked back across the street.

Consistent with John's testimony, Leslie said defendant came from the repair shop across the street and started yelling at them. He was speaking both English and Spanish, and they ignored him until he crossed the street to the median. When John and his friend approached the median, Leslie could not hear what was being said, but she saw defendant pull a gun, which he kept "down low." Defendant came within two or three feet of John and within 10 feet of her. After defendant pulled out a gun, John retreated and told her to

3.

call the police. As she spoke to the dispatcher, defendant continued screaming as he walked backward. Defendant eventually went inside the repair shop, but he was still outside when deputies arrived. John and Leslie could see him, and they pointed him out to deputies.

Deputies Rivero, Santos, and Garcia were among the multiple sheriff's deputies dispatched to the scene. Rivero arrived first at approximately 10:45 p.m. with Santos behind him by only one minute or so. Rivero asked Leslie where the person who had brandished the firearm was and she pointed to an older Hispanic male, whom Rivero identified as defendant, across the street. Rivero saw defendant standing in the northbound traffic lanes, approximately 15 yards away. He did not see a firearm, but Leslie told him she had seen one, and he immediately began commanding defendant to drop the firearm and lay on the ground. Defendant was yelling incoherently in English and in Spanish, and he told Rivero to go away as he walked backward toward the repair shop.

The repair shop property was surrounded by a fence with a see-through iron gate, and there was a second interior gate in the middle of the yard that was solid. Rivero was able to see defendant as he entered the property and closed the perimeter gate, but lost sight of him when he went through the second gate and closed it. Santos also saw defendant retreat into the yard. At some point after defendant retreated, Garcia began commanding defendant over a loudspeaker in English and in Spanish that he was under arrest and to come out.

Deputies had established a perimeter and there was a sheriff's helicopter above the property, where there were two buildings. Rivero saw a light on in one of the buildings and the helicopter crew relayed that the light had turned off. Rivero had not seen anyone else around and believed that was where defendant was located. After relaying that information, approximately six deputes, including Rivero and a K-9 unit, approached the building. Deputies knocked and announced themselves, and they could see and hear

4.

defendant yelling from inside the office. Garcia was able to see defendant through a large window he had torn the exterior shade from, and he was giving defendant commands in both English and Spanish.

The door to the office was mostly glass with an iron security door that had bars but no privacy screen. Through the doors, Rivero could see defendant hiding behind a file cabinet, and he thought defendant was behaving as if paranoid. Defendant kept raising his hand and his head, up and down.

After Santos pried the security door open and smashed the door glass with a sledgehammer, deputies entered the office and arrested defendant. They located a silver Smith and Wesson handgun with a black handle on the floor next to where defendant had been hiding. Deputies cleared the building and did not locate anyone else.

Approximately two hours passed between the deputies' arrival and defendant's arrest. During the standoff, a records search was conducted on the property, and a dispatcher informed Santos that defendant's name was associated with the business. Santos obtained a photograph of defendant and, at some point during the standoff, showed it to John, who identified defendant as the person who pulled a firearm and threatened to shoot him. On cross-examination, Santos testified he did not have time to leave the scene, create a six-pack lineup, and print it out given the situation involving a reportedly armed suspect who was not complying with deputies' commands. After defendant was arrested, Santos gave John an admonition and then John viewed defendant. John again identified defendant as the individual who pulled a firearm and threatened to shoot.

## DISCUSSION

### I.      Challenges to Conviction for Resisting a Peace Officer

#### A.      Substantial Evidence Claim

Defendant claims his conviction for resisting a peace officer is not supported by substantial evidence. He advances two arguments. First, he contends there is no

evidence that prior to entering the repair shop office, he understood the deputies' commands in English, and he cannot be convicted for violating section 148 by merely failing to comply with commands he did not understand.  Second, he contends that once he retreated inside the office, his mere failure to open the door cannot support conviction under section 148.  We find no merit to either argument.

### 1.    Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)).  On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.)  "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248

6.

Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

### 2.    Elements of Offense

"'Penal Code section 148 makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any public officer, [or] peace officer … in the discharge or attempt to discharge any duty of his or her office or employment.'  (Pen. Code, § 148, subd. (a)(1).)  "'The legal elements of a violation of section 148, subdivision (a) are as follows:  (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.'"'"  (*In re R.M.* (2018) 22 Cal.App.5th 582, 588, quoting *In re Amanda A.* (2015) 242 Cal.App.4th 537, 546.)  "'The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence.'"  (*In re Amanda A., supra*, at p. 546, quoting *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.)

### 3.    Analysis

#### a.    Comprehension of Commands

Rivero and Santos were the first deputies to arrive in response to Leslie's 911 call, within approximately one minute of one another.  Both were in uniform and driving marked patrol vehicles, and there is evidence in the record that Rivero had his flashing red and blue lights on.  Rivero parked across the street from the repair shop and Santos parked on the same side as the shop in a position to block the northbound traffic lanes.  There was no one else in the area at that time of night except for the responding deputies, defendant, and the group connected to the disabled vehicle across the street.  John and Leslie testified that defendant was speaking in both English and Spanish, and John testified that defendant threatened him in English.  Rivero also testified that defendant was speaking in both English and Spanish, and that defendant told him to go away as he

7.

repeatedly commanded defendant to drop the firearm and lay on the ground. This evidence is more than sufficient to support a reasonable inference that defendant understood and resisted Rivero's commands.

Defendant argues against this conclusion by dismissing John's and Leslie's testimony as lacking sufficient specificity concerning his command of English, and he asserts the jury found them lacking in credibility given his acquittal for making criminal threats and brandishing a weapon. These arguments are unavailing.

Three witnesses testified that defendant was speaking both English and Spanish. Further, Rivero's specific, repeated commands; defendant's response to go away; and the surrounding circumstances—uniformed deputies in marked patrol vehicles responding to a quiet area where defendant just had an unfriendly encounter with a stranded motorist across the street—amply support a finding that defendant understood Rivero was trying to detain him. The verdicts of acquittal on other charges do not support a contrary conclusion.

Inconsistent verdicts are generally allowed to stand and "may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis* (2001) 25 Cal.4th 610, 656; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890–891 (*Covarrubias*); *People v. Brugman* (2021) 62 Cal.App.5th 608, 629–630.) "'[T]here is no prohibition against considering all of the evidence in the record to determine the sufficiency of evidence on one count merely because the jury did not reach a unanimous verdict on a count to which the evidence may have related.'" (*Covarrubias, supra*, at p. 890.) "'[A] criminal defendant … is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This

8.

review should be independent of the jury's determination that evidence on another count was insufficient.'" (*People v. Lewis*, *supra*, at p. 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67; accord, *Covarrubias, supra*, at p. 891; *People v. Brugman, supra*, at p. 632.)

We need not divine the bases for the acquittals to resolve defendant's claim, but given testimony that defendant was mumbling incoherently, he pointed a firearm at the ground, and John did not think defendant was going to shoot, the jury may have concluded the prosecutor failed to prove, beyond a reasonable doubt, that defendant's threat caused John "to be in *sustained* fear for his … own safety or for his … immediate family's safety" (§ 422, subd. (a), italics added; accord, *People v. Brugman, supra*, 62 Cal.App.5th at p. 631), or that defendant brandished the firearm "in a rude, angry, or threatening manner" (§ 417, subd. (a)(2)). Whatever the explanation for the acquittals, defendant's conviction for resisting a peace officer is supported by substantial evidence in the record.

### b. Refusal to Open Door

Defendant's next claim is dependent upon our acceptance of his argument that he did not understand Rivero's commands and committed no crime in walking away. Relying on *People v. Cressey* (1970) 2 Cal.3d 836 (*Cressey*) and *People v. Wetzel* (1974) 11 Cal.3d 104 (*Wetzel*), defendant argues that having not yet committed any crime, his subsequent refusal to open the office door to deputies cannot support a conviction under section 148.

In *Cressy*, the California Supreme Court observed that "[r]efusal to open the door is obviously not a public offense." (*Cressey, supra*, 2 Cal.3d at pp. 841–842, fn. 6.) Subsequently, in *Wetzel*, the court held that the defendant "had the right to withhold consent to enter [her apartment] and, as long as entry was not sought on any other ground than with her consent she committed no impropriety and certainly not a violation of section 148." (*Wetzel, supra*, 11 Cal.3d at p. 110.) In addition, "section 148 does not

9.

'criminalize[] a person's failure to respond with alacrity to police orders' and … the First Amendment protects the right to dispute an officer's actions." (*In re Chase C.* (2015) 243 Cal.App.4th 107, 119, quoting *People v. Quiroga* (1993) 16 Cal.App.4th 961, 966.)

However, defendant did not merely "passively refuse to open the door" to the office or merely question the deputies' orders. "*Wetzel* does not suggest the Fourth Amendment confers a right to refuse to obey reasonable police commands issued during lawful police conduct" (*People v. Williams* (2018) 26 Cal.App.5th 71, 91), and here, there is sufficient evidence defendant "knew full well" deputies were trying to detain him from the outset (*People v. Allen* (1980) 109 Cal.App.3d 981, 987). He refused to comply with Rivero's multiple commands, he retreated from Rivero and Santos as they tried to detain him, and he then hid inside the repair shop office. These actions suffice to support his conviction under section 148. (*In re Muhammed C., supra*, 95 Cal.App.4th at pp. 1329–1330 ["[P]hysical resistance, hiding, or running away from a police officer have been found to violate section 148."]; accord, *In re Charles G.* (2017) 14 Cal.App.5th 945, 956; *In re Amanda A., supra*, 242 Cal.App.4th at p. 546.)

### B.    Instructional Error

Alternatively, defendant claims that his failure to comply with Rivero's commands and his subsequent refusal to come out of the office constituted two separate acts. He argues that the prosecutor did not make an election as to which of the two acts she was basing the charged crime on; the exception for a continuing course of conduct is inapplicable; and, therefore, the trial court's failure to instruct the jury on unanimity was prejudicial error, requiring reversal of his conviction.[2] We disagree that a unanimity instruction was required here.

---

[2]    The model jury instruction on unanimity, CALCRIM No. 3500, provides: "The defendant is charged with _____ *<insert description of alleged offense>* [in Count _____ ] [sometime during the period of _____to _____]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved

10.

### 1.     Standard of Review

We review allegations of instructional error de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)  "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case."  (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)  "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that … is … predominantly legal," and "should be examined without deference."  (*People v. Waidla, supra*, at p. 733.)

### 2.     Unanimity Instruction

"In a criminal case, a jury verdict must be unanimous" and "the jury must agree unanimously the defendant is guilty of a *specific* crime."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); accord, *Ramos v. Louisiana* (2020) ___ U.S. ___, ___ [140 S.Ct. 1390, *1397]; *Covarrubias, supra*, 1 Cal.5th at pp. 877–878.)  In California, "cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act."  (*Russo, supra*, at p. 1132.)  "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'"  (*Ibid.*; accord, *Covarrubias*, *supra*, at p. 878; *People v. Brown* (2017) 11 Cal.App.5th 332, 341.)

"'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must

---

that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

11.

have done *something* sufficient to convict on one count.'" (*Russo, supra*, 25 Cal.4th at p. 1132.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*) Thus, "[i]n deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135.)

Relevant to the parties' arguments, where the need for either an election or a unanimity instruction is triggered, there is a continuous course of conduct exception. (*People v. Hoyt* (2020) 8 Cal.5th 892, 927; *People v. Jo* (2017) 15 Cal.App.5th 1128, 1178; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 572; *People v. Napoles* (2002) 104 Cal.App.4th 108, 115.) "This exception arises in two contexts. [Citation.] First, a unanimity instruction is not required when the criminal acts are so closely connected that they form part of the same transaction, and thus one offense. The second context occurs when the statute defines the offense to comprise a continuous course of conduct over a period of time." (*People v. Jo, supra*, at p. 1178; accord, *People v. Hernandez, supra*, at p. 572; *People v. Napoles, supra*, at pp. 115–116.) Only the first context is at issue here.

### 3. Analysis

As an initial matter, we disagree with defendant's characterization of the resisting charge as based on two discrete crimes rather than one. In closing argument, both parties treated the event as one incident, or one crime. This is understandable given that, in rapid succession, defendant ignored Rivero's commands, entered through and closed two property gates, and hid from deputies. That the jury could have found the crime complete upon defendant's refusal to comply with Rivero's initial commands suggests two theories

rather than two discrete crimes, and a unanimity instruction is not required in that situation.

Regardless, if we accept defendant's parsing of the event into two discrete crimes, the continuous course of conduct exception nevertheless applies and the failure to instruct on unanimity was not error. "[A] continuous course of conduct exists when the same actor performs the same type of conduct at the same place within a short period of time, such that a jury cannot reasonably distinguish different instances of conduct." (*People v. Hernandez, supra*, 217 Cal.App.4th at p. 573; accord, *People v. Williams* (2013) 56 Cal.4th 630, 682.) Here, "there was no realistic possibility of disagreement" over what was clearly "a continuous course of conduct." (*People v. Hoyt, supra*, 8 Cal.5th at p. 927.) Defendant's characterization of the events as separate because they involved different deputies, different locations, and different times is unpersuasive. While defendant refused to obey multiple deputies' repeated commands, he did so during one event involving one law enforcement response to one location, and although the entire event unfolded over several hours, defendant's retreat from the street into the property where he hid occurred at the beginning of the incident "'within a very small window of time.'" (*People v. Williams, supra*, at p. 682.)

Defendant's reliance on *People v. Melhado* (1998) 60 Cal.App.4th 1529 and similar authority is misplaced. *Melhado* concerned an approximately two-hour window during which the defendant made two separate threats to blow up a repair shop. (*Id.* at p. 1533.) However, the defendant left the repair shop after the first threat and the owner called police, who came and took a report. (*Ibid.*) Two hours later, the defendant returned to the shop and made the second threat. (*Ibid.*) Police again came and took a report. (*Ibid.*) The defendant was later arrested when he returned to the shop a third time. (*Ibid.*) The timeline in this case did not involve two independent acts of resistance by the defendant to two independent law enforcement responses, separated by a clear and complete break between the acts.

13.

Defendant also relies on *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*). It, too, is distinguishable. In *Covarrubias*, the California Supreme Court addressed its holding on unanimity in *Davis*, which involved the murders of a driver and his passenger after the defendant and three other men commandeered the victims' car. (*Covarrubias, supra*, 1 Cal.5th at p. 879.) The court explained, "We reversed the robbery conviction on the ground that the defendant was entitled to a unanimity instruction because the evidence showed two distinct acts of robbery constituting the charged crime—the taking of the car from the driver and passenger and the taking of the rings from the passenger. [Citation.] Importantly, 'the potential defenses to the two acts of robbery were *entirely different*.' [Citations.] [The d]efendant claimed the passenger 'was not legally in possession' of the car, and the taking of the rings 'constituted only the lesser included crime of theft' on the ground that there was evidence [the] defendant formed the intent to steal the passenger's rings after he killed her. [Citation.] Based on the evidence, some jurors may have had a reasonable doubt that the intent to take the rings was formed while the passenger was alive; others may have had a reasonable doubt whether the passenger was in possession of the driver's car. [Citation.] We concluded that because 'there was evidence from which the jury could have found [the] defendant guilty of robbery based on the car but not the rings,' the trial court's failure to provide a unanimity instruction was prejudicial." (*Ibid.*)

"As *Davis* makes clear, however, a unanimity instruction is not required if 'the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed [the] defendant committed one act but disbelieved that he committed the other, or because "there was no evidence from which the jury could have found [the] defendant was guilty of" the crime based on one act but not the other.'" (*Covarrubias, supra*, 1 Cal.5th at p. 879, quoting *Davis, supra*, 36 Cal.4th at p. 562.)

Defendant argues that he was pursuing two separate defenses based on the events, but the record does not bear this out. This was a difficult case for the defense given that

the events occurred in an uncrowded location, John and Leslie pointed defendant out to deputies, defendant was connected by name to the repair shop where he retreated, and deputies arrested him on the premises after breaking through the door. Defense counsel attempted to create reasonable doubt by focusing on details the witnesses did not recall or where there was some inconsistency, on the darkness of the night, and the general chaos of the situation. Counsel focused more specifically on the criminal threats charge, including the lack of any indication John was in sustained fear, and the absence of DNA testing connecting defendant to the firearm. With respect to the resisting charge, counsel argued only that defendant did not initially resist an officer.[3] This does not constitute the pursuit of two "'*entirely different*'" defenses. (*Covarrubias, supra*, 1 Cal.5th at p. 879, quoting *Davis, supra*, 36 Cal.4th at p. 562.)

For foregoing reasons, we conclude that the trial court's failure to instruct the jury on unanimity was not error. Therefore, we do not reach defendant's prejudice argument.

## II. Denial of Motion to Suppress In-field and In-court Identifications

### A. Background

Prior to trial, defendant filed a motion to suppress John's in-field identifications of him and exclude any future in-court identifications as tainted by the in-field identifications. (§ 1538.5.) Pursuant to Evidence Code section 402, the trial court held an evidentiary hearing at which John testified.

John estimated he was within 10 feet of defendant, and he would be able to recognize defendant. After Leslie called 911 and deputies arrived, defendant was still across the street and John pointed defendant out. He recalled that Deputy Santos showed

---

**3**     Counsel stated, "Did [defendant] resist arrest? Well, I would say not initially. Someone shows up. You can't make out what their car is. Don't know who they are. They don't really identify themselves. How do you even know who they are? [¶] I submit to you that there may come a point if we can understand what is actually committed here, although we don't have a good record of that either through the PA system that perhaps—perhaps [defendant], who was in the office of his building, being ordered to exit by police officers maybe he should have. That's for you to decide."

him a photograph on a computer and that he saw defendant approximately one hour later, after arrest. John then identified defendant in the courtroom.

On cross-examination, John testified it was dark in the area and the street was wide. When he was shown the photograph on the computer, he was asked if that was the person he had encountered and he said yes. The photograph included defendant's name and, prior to being shown the photograph, deputies repeatedly called defendant by name over the loudspeaker. Subsequently, another deputy showed John the same photograph on his cell phone. When John saw defendant taken out of the repair shop, he could not see defendant clearly due to the distance, but deputies had a light over the repair shop and he knew it was defendant. He saw defendant placed in a patrol car and then identified defendant in the in-field showup.

On redirect examination, John testified that the person taken out of the repair shop was wearing the same clothes as the person who threatened him. He also testified that he identified defendant in the photograph based on his face, not his name.

The trial court concluded that other factors, including the significant length of time John had to observe defendant at the scene, outweighed the suggestiveness of the procedure used, and the court denied defendant's motion to suppress. On appeal, defendant claims the trial court erred in denying his motion to suppress, admission of the in-field identifications and in-court identifications violated his right to due process, and the error was prejudicial. We reject the claim.

B.     Legal Standard

"To determine whether the admission of identification evidence violates due process, 'we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the

16.

suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.'" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 768 (*Holmes*), quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 989; accord, *People v. Wilson* (2021) 11 Cal.5th 259, 283, 285–286.)

"A procedure is unfair if it suggests in advance the identity of the person police suspect." (*Holmes*, *supra*, 12 Cal.5th at p. 768.) "Reversal is not warranted unless there is a 'substantial likelihood of irreparable misidentification.' [Citation.] 'In other words, "[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends."'" (*Ibid.*; accord, *People v. Wilson, supra*, 11 Cal.5th at p. 283.)

Defendant "'bears the burden of demonstrating the existence of an unreliable identification procedure.'" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942, quoting *People v. Cunningham, supra*, 25 Cal.4th at p. 989; accord, *People v. Sanchez* (2019) 7 Cal.5th 14, 37.) "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." (*People v. Gonzalez, supra*, at p. 943; accord, *Holmes, supra*, 12 Cal.5th at p. 768.) "We may affirm the ruling if it is correct on any theory, even if the trial court's reasoning was incorrect." (*People v. Hall* (2020) 57 Cal.App.5th 946, 952; accord, *Zamudio, supra*, 43 Cal.4th at p. 351, fn. 11.)

### C.    Analysis

"A single person showup, or a single person photograph, is not inherently unfair or suggestive." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 674; accord, *People v. Ochoa* (1998) 19 Cal.4th 353, 413.) "'A "lineup" is a relatively formalized procedure wherein a suspect, who is generally already in custody, is placed among a group of other persons whose general appearance resembles the suspect. The result is essentially a test of the reliability of the victim's identification. [Citation.] … An in-the-field showup, on

17.

the other hand, is generally an informal confrontation involving only the police, the victim and the suspect. One of its principal functions is a prompt determination of whether the correct person has been apprehended. [Citation.] Such knowledge is of overriding importance to law enforcement, the public and the criminal suspect himself. [Citation.] An in-the-field showup is not the equivalent of a lineup. The two procedures serve different, though related, functions, and involve different considerations for all concerned.'" (*People v. Rodriguez* (1987) 196 Cal.App.3d 1041, 1049, quoting *People v. Dampier* (1984) 159 Cal.App.3d 709, 712–713.)

"'[S]ingle-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.] The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.'" (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359, italics added, quoting *In re Carlos M.* (1990) 220 Cal.App.3d 372, 387; accord, *In re Richard W.* (1979) 91 Cal.App.3d 960, 970.)

In this case, the trial court found no manipulation on the part of the deputies; noted the situation was not one in which the deputies were simply being lazy or incompetent; and observed the circumstances were "somewhat unusual," with a threat involving a firearm and the need to gain control of the situation. In addition, the court noted the unusually extended period of time in which John observed defendant, which it found significant; John's confidence in his identification; and the corroborating circumstance that after John identified defendant from the photograph, it was defendant who was removed from the building.

18.

We find no error with the court's ruling. As the trial court recognized, deputies were engaged in an active, ongoing standoff with a suspect who was noncompliant and reportedly armed with a gun. John pointed out the suspect to deputies before the suspect hid from them on the property, and in later showing John a photograph of defendant, deputies were seeking to confirm defendant's identity rather than attempting to identify an unknown suspect based on nothing more than a fleeting sighting by a witness. Furthermore, the general area was deserted, deputies located defendant in the office and apprehended him, and no one else was found in the area. Under these circumstances, notwithstanding that the lineup photograph had defendant's name on it and they were calling his name over a loudspeaker, the photographic identification and subsequent showup were not "'*unduly* suggestive and unnecessary.'" (*Holmes, supra*, 12 Cal.5th at p. 768, italics added.) Moreover, even if we assumed otherwise for the sake of argument, for the reasons discussed herein, John's on-scene identification of defendant "'was nevertheless reliable under the totality of the circumstances.'" (*Ibid.*) This forecloses defendant's due process claim (*ibid.*), and we need not consider his related argument that the on-scene identifications tainted later in-court identifications.

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

DeSANTOS, J.

19.